**FREIGHTLINER OF GRAND RAPIDS, INC., Plaintiff, Counter–Defendant,**

v.

**UNITED STATES of America, Defendant, Counter–Claimant.**

No. 1:02–CV–492.

United States District Court, W.D. Michigan, Southern Division.

Sept. 29, 2004.

Mark S. Pendery, Terry L. Zabel, Rhoades McKee, Grand Rapids, MI, for Plaintiff.

Stephen T. Lyons, U.S. Department of Justice, Tax Division (Northern Region) Ben Franklin Station, Washington, DC, for Defendant.

Charles R. Gross, U.S. Attorney (Grand Rapids), Grand Rapids, MI, for Claimant.

## OPINION

ROBERT HOLMES BELL, Chief Judge.

Plaintiff filed this action seeking a refund of the retail excise tax it paid on its sale of one incomplete chassis cab and one converted chassis cab. The government filed a counterclaim for the unpaid balance of its excise tax assessment for 19 incomplete chassis cabs and 21 converted chassis cabs sold by Plaintiff. This matter is before the Court on the parties' cross-motions for summary judgment.

## I.

Plaintiff Freightliner of Grand Rapids, Inc. ("Freightliner") is a truck dealer located in Grand Rapids, Michigan. Freightliner deals in products manufactured by Freightliner U.S. LLC. Between January 1, 1995, and June 30, 1996, (6 quarters) Freightliner purchased 40 incomplete chassis cabs on a tax-free basis from the manufacturer. Freightliner sold 19 of the incomplete chassis cabs to CTR, Inc. ("Cabriolet") without engaging in any further manufacturing to the vehicles. Cabriolet is a final stage manufacturer. Cabriolet converted the incomplete chassis into custom recreational vehicle ("RV") tow vehicles called Cabriolet Sportliners and Cabriolet Patriots (collectively referred to as "Sportliners") and sold them to other businesses for sale to individual consumers.

The 19 incomplete chassis cabs Freightliner sold to Cabriolet were not equipped with standard tractor safety devices. Freightliner did not obtain a certificate from Cabriolet that Cabriolet would not equip the incomplete chassis cabs for use as tractors ("will-not-equip" certificates). Neither did Freightliner obtain, at the time of the sale, a written certificate from Cabriolet that it would either resell the vehicles or lease them under a long-term lease and therefore become responsible for paying any excise tax on such sales. Freightliner did not pay an excise tax on any of the sales of the 19 incomplete chassis cabs at the time of sale.

Freightliner paid Cabriolet to convert the remaining 21 chassis cabs into custom RV tow vehicles and then to return them to Freightliner. Cabriolet provided Freightliner with a Manufacturers Certificate of Origin ("MCO"), which classified the body type as "recreational passenger/tow vehicle." Freightliner sold these

21 vehicles during the applicable time period to its customers. Freightliner did not pay an excise tax on any of the sales of the 21 converted chassis cabs at the time of sale.

In 1996 the government audited Freightliner's excise tax returns and assessed an excise tax based, in part, on its determination that the sales of the 19 incomplete chassis cabs were subject to the 12% retail excise tax found in Internal Revenue Code § 4051, 26 U.S.C. § 4051.[1] The IRS also assessed an excise tax on the sale of the 21 conversion vehicles. Freightliner paid the excise tax on one vehicle in each category for one quarter and filed a claim for refund of the amounts paid. When the claims were denied Freightliner filed this refund suit for abatement and refund of the alleged overpayments. The government has filed a counterclaim for the unpaid balance of the assessments plus penalties and interest.

The parties have each filed two cross-motions for partial summary judgment, one addressing the taxability of the sale of the 19 incomplete chassis cabs, and one addressing the taxability of the sale of the 21 converted chassis cabs.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim then the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## III.

This case requires the Court to determine whether Plaintiff's sale of 19 incomplete chassis cabs and 21 converted chassis were subject to taxation under the relevant retail excise tax statutes and their implementing regulations.

IRC § 4051 [2] imposes a 12% excise tax on the first retail sale of heavy trucks and trailers.[3] In general terms, IRC § 4051

---

**1.** This opinion will focus on two sections of the Internal Revenue Code, 26 U.S.C. §§ 4051 and 4052. They will be referenced in the opinion as IRC § 4051 and IRC § 4052.

**2.** Unless otherwise noted, all citations to statutes and regulations are to those applicable to the periods at issue, January 1, 1995, and June 30, 1996.

**3.** Section 4051(a) provides in relevant part:

(1) In general.—There is hereby imposed on the first retail sale of the following articles (including in each case parts or accessories sold on or in connection therewith or with the sale thereof) a tax of 12 percent of the amount for which the article is so sold:
 (A) Automobile truck chassis.
 (B) Automobile truck bodies.
 (C) Truck trailer and semitrailer chassis.
 (D) Truck trailer and semitrailer bodies.

provides that all tractors, regardless of their gross vehicle weight, are taxable, but trucks are only taxable if the gross vehicle weight is in excess of 33,000 pounds. There is no dispute that the 40 chassis cabs at issue in this case have a gross vehicle weight of less than 33,000 pounds. (Compl. & Answ. ¶ 9). Accordingly, the chassis cabs at issue are only taxable under §4051 if they are classified as "tractors" pursuant to §4051(a)(1)(E).

When engaging in statutory interpretation, the Court looks first to the language of the statute itself to ascertain its plain meaning. *Walker v. Bain*, 257 F.3d 660, 666 (6th Cir.2001). "Every word in the statute is presumed to have meaning, and we must give effect to all the words to avoid an interpretation which would render words superfluous or redundant." *Id.* at 667.

An agency's construction of the statute which it administers is evaluated under the principles set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the statute speaks clearly to the precise question at issue, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, however, the statute does not directly address the precise question at issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. *See also Barnhart v. Walton*, 535 U.S. 212,

217–18, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (applying *Chevron* analysis in determining lawfulness of agency's interpretation of statute).

The regulations the government relies on in this case are Temporary Treasury Regulations that were adopted in 1983. The fact that the regulations at issue are temporary does not affect the analysis. Temporary regulations receive the same *Chevron* deference as do permanent regulations. *Hospital Corp. of America v. Commissioner of Internal Revenue*, 348 F.3d 136, 140–41 (6th Cir.2003)(evaluating 1987 Temporary Treasury Regulation under *Chevron* principles). *See also E. Norman Peterson Marital Trust v. Commissioner*, 78 F.3d 795, 798 (2d Cir.1996)("Until the passage of final regulations, temporary regulations are entitled to the same weight we accord to final regulations.").

**IV.**

The parties' first cross-motions for partial summary judgment concern the 19 incomplete chassis cabs.

**A. Vehicles within IRC § 4051(a)(1)**

IRC §4051(a)(1) lists five categories of vehicles [4] that are subject to the retail excise tax. Freightliner contends that because Congress specifically listed the five categories of vehicles subject to the excise tax, it intended to exclude all other vehicles. Freightliner contends that because Congress intended to exclude all vehicles

---

(E) Tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer.

(2) Exclusion for trucks weighing 33,000 pounds or less.—The tax imposed by paragraph (1) shall not apply to automobile truck chassis and automobile truck bodies, suitable for use with a vehicle which has a gross vehicle weight of 33,000 pounds or

less (as determined under regulations prescribed by the Secretary).
IRC § 4051(a).

4. Although the statute uses the term "articles," describing the articles as "vehicles" is less confusing and at least for purposes of this case does not change the statute's meaning.

that were not specifically enumerated in the statute, and because incomplete chassis cabs are not among the enumerated vehicles, that is the end of the *Chevron* analysis, and the Court must give effect to the unambiguously expressed intent of Congress that incomplete chassis cabs are not subject to taxation under IRC § 4051.

 The Court agrees with Freightliner that statutes imposing a tax are construed liberally in favor of the taxpayer. *Limited, Inc. v. Comm'r,* 286 F.3d 324, 332 (6th Cir.2002). The Court also agrees with Freightliner that Congress intended to limit the application of IRC § 4051 to the five categories of vehicles listed. Under the "general rule of statutory construction, *expressio unius est exclusio alterius,* the specific mention of one thing in a statute implies an intent on the part of the legislature to exclude another." *Warner v. Zent,* 997 F.2d 116, 137 (6th Cir.1993). Moreover, the temporary regulations for IRC § 4051 state that "a chassis or body which is not enumerated in paragraph (a)(1) of this section is not taxable under section 4051(a)(1) even though such chassis or body is used as a component part of a highway vehicle ...." 26 C.F.R. § 145.4051–1.

Nevertheless, Freightliner's argument that Congress intended to exclude incomplete chassis cabs from the scope of IRC § 4051 is not persuasive. Congress did not speak clearly to the precise question of incomplete chassis cabs. The statute does not specifically limit its application to "completed" automobile truck chassis, or "completed" tractors of the kind chiefly used for highway transportation. Incomplete chassis cabs are therefore not explicitly excluded by the statutory language. Moreover, an incomplete chassis cab is not a different vehicle than those listed in the statute—it is an incomplete vehicle that could become one or another of the vehicles listed. Congress' list of the five categories of vehicles subject to taxation under IRC § 4051 is ambiguous enough to include incomplete chassis cabs.

## B. Used for Highway Transportation

Freightliner also contends that the statutory language clearly excludes incomplete chassis cabs from the definition of tractors because the statute does not apply to all tractors, but only to tractors "of the kind chiefly used for highway transportation in combination with a trailer or semitrailer." IRC § 4051(a)(1)(E). It is undisputed that an incomplete chassis cab cannot be legally operated on a highway, cannot be registered with the Secretary of State, and is not equipped with a towing package. Freightliner contends that because of these facts, an incomplete chassis cab could never be considered a tractor "of the kind chiefly used for highway transportation in combination with a trailer or semitrailer."

Freightliner's argument assumes that the phrase "tractors chiefly used for highway transportation" refers only to vehicles that are ready to be licensed to operate on the highway. The statute does not contain a requirement that the vehicle be capable of being legally driven on the highway at the time of the sale. Accordingly, the Court finds that there is no unambiguously expressed intent to exclude incomplete chassis cabs from taxation under IRC § 4051.

Because Congress was silent or ambiguous with respect to the specific issue of incomplete chassis cabs, the *Chevron* analysis requires the Court to consider whether the regulations address the issues presented and whether the regulations are based on a permissible construction of the statute.

## C. Tractor

Although Congress did not discuss incomplete chassis cabs in IRC § 4051, there is a discussion of how to treat them in the Temporary Treasury Regulations that were adopted to implement IRC § 4051. 26 C.F.R. § 145.4051–1(e)(1)(ii).[5] Basically, these regulations require an incomplete chassis cab to be treated as a tractor if it is equipped with one or more of the safety devices contained in 26 C.F.R. § 4051–1(e)(1)(ii)(A–E), and require that it be treated as a truck if it is not equipped with any of these safety devices and the purchaser certifies in writing that the vehicle will not be equipped for use as a tractor.

There is no dispute that the 19 incomplete chassis cabs in this case were not equipped with any of the safety devices listed in 26 C.F.R. § 145.4051–1(e)(1)(ii)(A–E). There is also no dispute that there was never a certification in writing that the vehicles would not be equipped for use as tractors.

Freightliner contends that because the incomplete chassis cab it sold was not equipped with the safety features identified in 26 C.F.R. § 145.4051–1(e)(1)(ii) it cannot be treated as a tractor. Freightlin-er contends that the regulation's silence on how to treat an incomplete chassis cab that does not have the safety features or a certificate means that incomplete chassis cabs are exempt from taxation. Freightliner contends that at the very least, the regulation is ambiguous, and that it must accordingly be construed liberally in favor of the taxpayer. *See Limited, Inc.*, 286 F.3d at 332.

The government, on the other hand, contends that the regulations require an incomplete chassis cab that is not equipped with any of the listed safety devices and that does not have a "will-not-equip" certificate to be treated as a tractor. The government contends that when the last paragraph states that an incomplete chassis cab with certification shall be treated as a truck, it assumes the converse, that without certification an incomplete chassis cab is a taxable tractor.

■ The regulations are not a model of clarity. They do not explicitly state how to treat an incomplete chassis cab that does not have a "will-not-equip" certificate. Yet, a careful reading of the regulation as a whole reveals that the government's in-

---

5. The Temporary Treasury Regulations provide in pertinent part:

(1) Tractor. (i) The term "tractor" means a highway vehicle primarily designed to tow a vehicle, such as a trailer or semitrailer, but does not carry cargo on the same chassis as the engine. A vehicle equipped with air brakes and/or towing package will be presumed to be primarily designed as a tractor.

(ii) An **incomplete chassis cab** shall be treated as a **tractor if** it is equipped with one or more of the following:

(A) A device for supplying pressure from the chassis cab to the brake system (air or hydraulic) of the towed vehicle;

(B) A mechanism for protecting the chassis cab brake system from the effects of a loss of pressure in the brake system of the towed vehicle;

(C) A control linking the brake system of the chassis to the brake system of the towed vehicle;

(D) A control in the cab for operating the towed vehicle's brakes independently of the chassis cab's brakes; or

(E) Any other equipment designed to make it suitable for use as a tractor.

An **incomplete chassis cab** which is **not equipped** with any of the devices set forth in paragraphs (e)(1)(ii)(A) through (E) of this section shall be **treated as a truck if** the purchaser certifies in writing that the vehicle **will not be equipped** for use as a tractor.

26 C.F.R. § 145.4051–1(e)(1)(ii) (emphasis added).

terpretation is the only one that is consistent with the statutory scheme, that is true to the grammar and makes logical sense.

Under IRC § 4051 and the temporary regulations, vehicles are divided into two distinct categories, trucks and tractors. If it is a truck, its taxability depends on its gross vehicle weight ("gvw"). If it is a tractor, it is taxable regardless of its gross vehicle weight. The regulation defines tractors as completed vehicles and incomplete chassis cabs, i.e., vehicles that are not completed but have the potential to be incorporated into a tractor. The regulation then describes two types of incomplete chassis cabs. The first type of incomplete chassis cabs have certain listed equipment and for that reason alone are treated as tractors. The second type of incomplete chassis cabs do not have the listed equipment and can only be treated as a truck (i.e., non-taxable if 33,000 pounds or less gvw) if the purchaser certifies in writing that the vehicle will not be equipped for use as a tractor. Absent such a "will-not-equip" certificate, the regulation requires that even an incomplete chassis cab with none of the listed equipment be treated as a tractor.

According to the government, the regulations provide that where a vehicle is sold with the potential to be equipped as a tractor, but before it is so equipped, it is to be treated as a taxable vehicle unless the seller receives a certification in writing from the purchaser that the vehicle will not be equipped for use as a tractor.

When the statute and regulations are read as a whole, and in the context of the purposes of the statute, the government's position makes sense. At the time of the first retail sale of an incomplete chassis cab it cannot be determined whether the vehicle will become a truck or tractor. By its very nature, an incomplete chassis cab has the potential to become a part of a number of vehicles. It is logical to tax incomplete chassis cabs and to only exempt them if they are under 33,000 and they come with the "will-not-equip" certificate. It would not make sense to specifically state that incomplete cabs will be treated as trucks and be exempt from taxation if they are under 33,000 gvw and have "will-not-equip" certifications, but then to also exclude from taxation all incomplete chassis cabs. Freightliner's proposed interpretation of the regulation would render the certification language in the last paragraph meaningless. Moreover, the certification language makes sense as a method of preventing tax avoidance. If there were no certification requirement, the excise taxation of incomplete chassis cabs could be easily avoided because all a purchaser would have to do to avoid the tax would be to purchase a cab tax-free in the first retail sale and then contract with another party to incorporate it into a tractor.

The Court concludes that the regulation is properly read to provide that an incomplete chassis cab that does not have any of the listed equipment is to be treated as a tractor unless the purchaser certifies in writing that it will not equip the vehicle for use as a tractor. Plaintiff's sale of the 19 incomplete chassis cabs must be treated as taxable vehicles under the regulations implementing IRC § 4051 because they had the potential to be incorporated into a taxable vehicle and the purchaser could not or did not give a certificate that they would not be.

### D. First Retail Sale

The excise tax under IRC § 4051 only applies to "first retail sales." The term "first retail sale" is defined in IRC § 4052(a)(1) as "the first sale, for a purpose other than for resale or leasing in a

long-term lease, after production, manufacture, or importation."

Freightliner contends that even if an incomplete chassis is a taxable vehicle, the Court need look no further than the statute to find that Freightliner is not liable for the retail excise tax on its sale of the 19 incomplete chassis cabs. In support of this argument Freightliner first contends that the sale was not a "first retail sale," but the second sale, the first sale being when Freightliner USA, LLC sold the incomplete chassis cabs to Freightliner. Second, Freightliner contends that the sale was not the first sale "after production, manufacture, or importation" because Freightliner did not produce, manufacture, or import the incomplete chassis cabs. Third, Freightliner contends that the sale was not a first retail sale because the sale was for the purpose of resale. Finally, Freightliner contends that it did in fact obtain a resale certificate two years after the sale.

Freightliner's first two arguments lack merit because they fail to track the statute. As to the first argument, Freightliner has not shown that the sale from Freightliner USA, LLC to Freightliner was a sale "for a purpose other than for resale or leasing in a long-term lease," such that the sale would have constituted the first retail sale. As to the second argument, there is nothing in the statute that requires that the seller in a "first retail sale" have produced, manufactured or imported the article at issue.

The Court focuses instead on Freightliner's third and fourth arguments. With respect to these arguments the government contends that the statute must be read in conjunction with the temporary regulations. Upon review of IRC § 4052 this Court agrees that IRC § 4052 does not address all of the procedures involved for determining whether a sale is a "first

retail sale" for purposes of the statute. Congress clearly intended the Secretary to prescribe rules and regulations to implement IRC § 4052. The statute contains numerous references to matters to be "determined by the Secretary" and to rules and regulations "prescribed by the Secretary." Under the version of IRC § 4052(d) in effect at the time of the sale, the Secretary was authorized to prescribe regulations under IRC §§ 4051 and 4052 similar to the rules of IRC § 4222 relating to registration for certain tax-free sales under IRC § 4221. *See Volvo Trucks North America, Inc. v. U.S.*, 2003 WL 223421, *1 (M.D.N.C.2003) (IRC § 4052(d) "gave the Secretary of the Treasury the authority to promulgate regulations setting forth registration and certification requirements to be met before the excise tax on trucks could be shifted from the manufacturers to their dealers").

Pursuant to IRC § 4052(d) the Secretary did in fact adopt Temporary Treasury Regulations relating to registration. Those regulations clarify that "first retail sale" is "a taxable sale," and then proceeds to define "taxable sale." 26 C.F.R. § 145.4052–1(a). Under the regulations the sale of an article is a taxable sale unless:

(i) The sale is a tax-free sale under section 4221,

(ii) Both the purchaser and the seller are registered under section 4222 and § 48.4222(a)–1 and the seller has in good faith accepted from the purchaser a proper certification, as provided in paragraph (a)(6) of this section, executed in good faith, that the purchaser intends to lease such an article on a long-term basis or resell such articles, or

(iii) There has been a prior taxable sale of the article. Notwithstanding the preceding clause, the sale of a chassis or body of a trailer or semitrailer ("trailer

or semitrailer") less than six months after a taxable sale of the article shall be treated as a taxable sale.

26 C.F.R. § 145.4052–1(a)(2).

The regulation describes the purchaser's certification as follows:

(6) *Certificate.* A certificate signed by the purchaser, or an officer or employee authorized by the purchaser to sign the certificate, may be accepted by a seller in support of a nontaxable sale to the purchaser. If it is impracticable to furnish a separate certificate for each sale because of the frequency of sales to such purchaser, a certificate covering all orders between given dates ... will be acceptable ....

26 C.F.R. § 145.4052–1(a)(6).

Freightliner contends that the regulation's definition of "first retail sale" is completely incompatible with Congress' definition in IRC § 4052 and is not based on a permissible construction of the statute. Freightliner contends that IRC § 4052 did not give the secretary authorization to create a new definition of "first retail sale," particularly not one that is at odds with the definition in the statute. Freightliner also contends that IRC § 4222 says nothing about retail sale or certification, so the inclusion of these terms in the temporary regulation of 26 C.F.R. § 145.4052–1 is an improper expansion of the authority granted by Congress.

Freightliner's argument fails to take into consideration the regulations adopted pursuant to IRC § 4222. Those regulations, like the regulations in 26 C.F.R. § 145.4052–1, require the purchaser to furnish in writing to the seller the exempt purpose for which the article is being purchased. 26 C.F.R. § 48.4222(a)–1(c) (incorporating the terms of IRC § 4221–1(c)). Thus, the court in *Volvo Trucks North America, Inc. v. U.S.,* 2003 WL 223421 (M.D.N.C.2003), properly found that "[p]ursuant to IRC Section 4052(d), the Secretary of the Treasury promulgated 26 C.F.R. § 145.4052–1. As directed by IRC Section 4052, this regulation imposed the same requirements as those imposed by Section 4222 and its regulations." *Id.* at *2.

Under the regulation, all sales of taxable items are deemed to be "first retail sales" within the meaning of IRC § 4051 unless one of the three exceptions described in 26 C.F.R. § 145.4052–1(a)(2) applies. The only exception that Plaintiff argues applies is the resale exception. However, that exception only permits the tax responsibility to be shifted from the seller to the purchaser if the purchaser has signed a certificate agreeing that it intends to resell or lease the vehicles on a long-term basis. There is no question that the sale of the 19 incomplete chassis cabs did not have the appropriate tax-responsibility-shifting certificates at the time of the sale.

■ Freightliner contends that assuming it was required to obtain an exemption certificate in order to avoid taxation, the incomplete chassis cabs are still exempt from excise tax because Freightliner did in fact secure exemption certificates after the sale of the incomplete chassis cabs to Cabriolet. The government correctly responds, however, that in order for a sale to be exempt, the certificate must be received at the time of the sale. In this case Cabriolet delivered certificates between 1 to 2¼ years after the excise returns were due. The taxability of the sale is determined as of the time of the sale, not at some unknown date in the future. There is no support for Freightliner's assumption that a tax liability properly assessed can be avoided if the seller obtains a certificate from the purchaser at any time after the sale. Although the language of 26 C.F.R. § 145.4052–1 does not directly impose a

time period for the certificate, the language used in the regulations clearly indicates that the certificate must be provided prior to the sale. The regulation provides that "the sale of an article is a taxable sale unless ... the seller **has** in good faith **accepted** from the purchaser ...." 26 C.F.R. § 145.4052–1. This language is sufficient to show that the certificate must be provided at the time of the sale for the sale to be exempt from taxation. It is also the only workable interpretation of the statute because the tax is imposed at the time of the sale. Without a certification a correct excise tax return could not be filed.

The Court is satisfied that the regulations in 26 C.F.R. § 145.4052–1 are based on a permissible construction of the statute. The Court further finds that Freightliner's sale of the 19 incomplete chassis cabs to Cabriolet constitute a first retail sale because Freightliner did not obtain a resale certificate prior to or at the time of the sale as required by the regulation.

### V.

The parties' second cross-motions for summary judgment address the issue of whether the 21 chassis cabs converted by Cabriolet into RV tow vehicles and sold by Freightliner under the name Sportliner are tractors within the meaning of IRC § 4051(a)(1)(E) and subject to the 12% retail excise tax.[6]

Freightliner contends the Court should look no further than the statute. According to Freightliner, these non-commercial recreational tow vehicles cannot be treated as tractors under the statute because they are not "chiefly used" for towing, and because they do not tow "trailers or semi-

trailers" within the meaning of IRC § 4051(a)(1)(E).[7]

### A. Chiefly Used

Freightliner has presented considerable evidence in support of its contention that owners of Sportliners do not "chiefly use" these vehicles for towing. More mileage is put on a Sportliner without a trailer than with a trailer. (Sinor dep. at 134–45). Freightliner has presented the testimony of several Sportliner owners who testified that they use their Sportliners only 10–40% of the time for towing a trailer. (Bosch dep. at 114; Jordan dep. at 34; Kavanaugh dep. at 40–41). The owners testified that the Sportliner is such a versatile vehicle that they use it as their only mode of transportation when they are away from home and as their second vehicle when they are at home. (Bosch dep. at 59; Jordan dep. at 36). They use their Sportliner just like a pickup truck, but compare its ride and comfort to that of any other luxury automobile. (Bosch dep. at, 110–11; Kavanaugh dep. at 40–41). Of the 27 Sportliner owners who responded to a questionnaire, 21 answered that they used their Sportliner less than 50% of the time for towing. (Docket # 51, Ex. M).

The government contends that in construing the phrase "chiefly used," the Court should not consider the actual use of the vehicle after it is purchased. Because the retail excise tax applies to the first retail sale of the vehicle, the government contends that taxability must be determined before there is any actual use of the vehicle, and the tax must be applied in an objective manner to a class of vehicles rather than to each purchaser's individual use of the vehicle.

---

**6.** There is no dispute that if these 21 Sportliners are tractors within the meaning of IRC § 4051(a)(1)(E), Freightliner's sales of these Sportliners were first retail sales within the meaning of IRC §§ 4051 and 4052 and their implementing regulations.

**7.** *See* footnote 3.

The Court agrees that because the taxability of a vehicle must be determined at the time of the first retail sale, an actual use standard is unworkable. The statute is accordingly ambiguous with respect to what it means for a vehicle to be "chiefly used" in combination with a trailer or semitrailer. Because the statute does not speak clearly to the precise question at issue, Freightliner's argument that the analysis can stop with consideration of the phrase "chiefly used" under the statute is incorrect.

## B. Trailers or Semi-trailers

Freightliner's second statutory argument is that Sportliners do not tow "trailers or semitrailers" within the meaning of IRC § 4051(a)(1)(E).

The government contends this Court has no jurisdiction to consider this argument because it was not raised in Freightliner's claim for refund. In its claim for refund Freightliner argued that the vehicle is exempt from the excise tax because is a truck with a gross vehicle weight of 33,000 pounds or less. Freightliner did not argue that if it is a tractor, it does not pull a trailer. (Compl., Ex. 10). "Numerous cases sustain the principle that grounds on which a claim for a tax refund is made must be specifically set forth in the claim for refund itself, otherwise the court in a refund action is without jurisdiction to consider them." *Estate of Bird v. United States,* 534 F.2d 1214, 1219 (6th Cir.1976) (citing cases). *See also Salyersville Nat'l Bank v. United States,* 613 F.2d 650, 651 (6th Cir.1980) ("plaintiff is barred from relying on any bases for relief not raised in its claim for refund").

Whether the Sportliner is a truck or a tractor are basically two sides of the same issue. Moreover, Freightliner's contention that recreational trailers do not come within the phrase "trailer or semitrailer" under

IRC § 4051 was specifically raised in the Request for Technical Advice, (Compl.Ex. 7), so the Internal Revenue Service has had an opportunity to consider this issue. Accordingly, the Court is satisfied that it has jurisdiction to consider the issue of whether the Sportliner is chiefly used to tow trailers.

■ Freightliner's argument that Sportliners are not used with trailers or semitrailers, however, is not persuasive. Freightliner's argument is based, in large part, on its assumption that the phrase "trailer or semitrailer" in IRC § 4051(a)(1)(E) refers only to commercial trailers. For example, Freightliner's expert, Richard J. Toner, has stated that the Sportliner is "not equipped to pull a trailer of the type pulled by commercial tractors." (Docket # 55, Ex. B). Freightliner has identified several aspects in which the Sportliner differs from the traditional commercial tractor. The Sportliner does not have a trailer air brake system, does not require a commercial driver's license, and is not capable of hauling commercial trailers or semitrailers. Freightliner has offered the testimony of Tom Siderius, a new truck sales person and a medium duty sales manager for Freightliner, to the effect that a Sportliner is "ill-suited for any commercial hauling" because it is not capable of pulling a commercial semitrailer, a commercial flatbed, an air brake tag trailer or any of the other normally-used commercial types of trailers. (Siderius dep. at 445).

There is no language in the statute that would limit the application of IRC § 4051(a)(1)(E) to commercial tractors and trailers. The statute is, at best, silent on this point, and the Court will not read such a limitation into the statute. In fact, because a taxable tractor under the statute can be any size and weight, it does not

appear that Congress intended to limit taxable tractors to commercial tractors.

In support of its contention RV trailers are not "trailers or semitrailers" within the meaning of IRC § 4051, Freightliner has also relied on the Eleventh Circuit's opinion in *Horton Homes, Inc. v. United States*, 357 F.3d 1209 (11th Cir.2004). In *Horton Homes* the Eleventh Circuit held that although Horton's toters fell within the statutory definition of "tractor," they did not fall within the statutory language of § 4051(a)(1)(E) because they were used exclusively for the transport of manufactured homes, and were accordingly not the kind of tractor chiefly used in combination with a trailer or semitrailer. *Id.* at 1212. In arriving at this conclusion the Eleventh Circuit reasoned as follows:

> Because Congress did not define "trailers or semitrailers," nor has the Treasury promulgated regulations defining those terms, we will define the words "trailer or semitrailer" according to their common meaning.... Under the dictionary definition, both trailers and semitrailers are used for the purpose of hauling goods or freight. "Freight" is defined as "goods ... loaded for transportation." A "good" is defined as "personal property." Manufactured homes are permanent dwellings, not personal property or freight. Accordingly, manufactured homes would not be used "in combination with a trailer or semitrailer."

*Id.* at 1212 n. 6 (citations omitted).

Freightliner contends the same analysis must be afforded RV trailers because many Sportliner owners are full-time RV'ers and to them their RV trailer and is their "permanent dwelling," and even if not permanent, it is a dwelling and not freight or goods as defined by the Eleventh Circuit.

This Court is not persuaded by the Eleventh Circuit's reasoning in *Horton Homes* because it appears that the court went to great lengths to define trailer and semi-trailer in such a way as to artificially exclude the manufactured homes. There appears to be no dispute that in the trucking industry a trailer is defined as a vehicle that is designed to be towed, all of whose weight is carried on its own chassis, and a semi-trailer is defined as a vehicle that is designed to be towed, a part of whose weight is carried on the chassis of the towing vehicle. A manufactured home being towed down the highway falls within these definitions. Furthermore, the Court does not agree with the Eleventh Circuit's conclusion that a manufactured home is not personal property when it is being towed down the highway.

In addition, the Court is not persuaded by Freightliner's reliance on *Horton Homes* because the reasoning employed in *Horton Homes* is not applicable to the issues in this case. *Horton Homes* distinguished manufactured homes from trailers on the basis that they were not personal property, presumably because manufactured homes will be permanently affixed to real estate. The same analysis does not apply to RV trailers. There can be no dispute that an RV trailer is personal property. Furthermore, Freightliner's argument that a dwelling cannot be a trailer must be rejected because it suggests application of a use test which, as discussed above, is not workable. Freightliner itself has noted that Sportliners are purchased for a number of uses, including hauling horse trailers and oil drills, uses that would not fit within a "dwelling" exception to the definition of trailer.

The Court concludes that the statutory language does not directly address the issue of what it means to be "chiefly used" in combination with a trailer or semitrail-

er, nor does it directly address the issue of whether an RV trailer can be a "trailer or semitrailer" within the meaning of the statute.

## VI.

Because the statute does not directly answer the issue of whether a Sportliner is a tractor or a truck, the Court must look to the regulations that were adopted to implement the statute. The Temporary Treasury Regulations that were adopted to implement § 4051 define "tractor" and "truck" as follows:

> The term "tractor" means a highway vehicle primarily designed to tow a vehicle, such as a trailer or semitrailer, but does not carry cargo on the same chassis as the engine. A vehicle equipped with air brakes and/or towing package will be presumed to be primarily designed as a tractor.

26 C.F.R. § 145.4051–1(e)(1)(i).

> The term "truck" refers to a highway vehicle that is primarily designed to transport its load on the same chassis as the engine even if it is also equipped to tow a vehicle, such as a trailer or semitrailer.

26 C.F.R. § 145.4051–1(e)(2).

The definition of tractor under the regulations contains two inquiries: whether the vehicle is primarily designed to tow, and whether it carries its cargo on the same chassis as the engine. A presumption may, in some cases, apply to the first inquiry. Accordingly, the Court will first consider whether the Sportliner is equipped with air brakes and/or a towing package, such that it will be presumed to be primarily designed as a tractor.

### A. Towing Package

The government does not contend that the Sportliner was equipped with air brakes. It does contend, however, that it was equipped with a towing package.

The government has presented evidence that Sportliners had many features which made it amenable to towing, including a 1/2 inch steel plate for mounting a fifth wheel hitch and retractable hitch, a custom RV fifth wheel bed, options for three alternative towing hitches, an electrical plug that connects the brakes and lights of the towing and towed vehicles, extra wide mirrors and mirror brackets, an exhaust brake to supplement the Sportliner's braking system when towing a large vehicle, two 75 gallon fuel tanks that allow for towing over longer distances without refueling, an 800 foot pound torque engine, oversized tires, controls in the cab that allow for the operation of the towed vehicle's brakes independent of the towing vehicle's brakes, a brake monitor for the trailer brakes, an optional slide out compartment for a generator to run the towed vehicle's electrical equipment, ping tanks that dampen the vibrations caused by the towed vehicle, and a gross combination weight rating of 40,000 pounds. According to the government these items add up to a towing package in the ordinary everyday sense of those words. The government's expert witness has also described these features as a "towing package." (Docket # 46, Ex. 15 at 5).

One of the Sportliner owners testified that his Sportliner came with hitch, a 7-way plug, and a brake controller, the combination of which he considered to be a towing package. (Bosch dep. at 130–31).

Cabriolet's advertising literature describes some of the towing features of the Sportliner. The literature states that the Sportliner comes with "Cabriolet's Custom RV 5th Wheel Bed" and that "Typical Equipment for the Freightliner Cabriolet" includes a "275 HP 800 lb/ft Torque Engine," a "21,500 lb. Pull Rite Hitch," and

a "Reese Receiver with Electrical Outlet." (Docket # 51, Ex. B). Freightliner itself described these features as a towing package in the protest filed with the IRS on August 2, 1997. (Docket # 46, Ex. 13) (stating that the Cabriolet conversion involved equipping the chassis "with a trailer towing package generally consisting of a double articulated fifth-wheel hitch and recreational vehicle trailer receiver.").

Freightliner contends that these features do not amount to a towing package. According to Freightliner, "[a] tow package, in the truck business, is a factory-installed/designed tractor package or full air brake ... trailer package." (Siderius dep. at 43). It appears that this argument is a continuation of Freightliner's contention that the term "trailer" in § 4051 means a commercial trailer. This Court has already determined above that this assumption is not justified by the statute. Accordingly, this Court does not agree that an air brake is essential to a towing package.

Freightliner's second response to the government's argument that the Sportliner came with a towing package is to point out that not all of the Sportliners were sold with trailer hitches. Cabriolet did not install a towing package, but instead made several different options available. (Pozeznik dep. at 57) ("You could call it a towing package, but we didn't. We had a list of options of things that you could do to this vehicle."). Sportliners were custom vehicles. Not every Sportliner was sold with a fifth wheel or a trailer hitch. (Pozeznik dep. at 44–45). Once in a while buyers would put a box or a van body on it, like a furniture hauling box, but that was a rare occurrence. (Pozeznik dep. at 49). Larry Gingerich, the owner of Cabriolet, agreed that Sportliners did not always have a hitch when they were sold to the dealer. (Gingerich dep. at 99).

Sometimes the dealer would install the hitch, but a hitch did not always end up on them. (Gingerich dep. at 99–100). Gingerich had heard of a couple of trucks that were being used like a farm truck, and Cabriolet put stake pockets in them for stake beds. He did not know if they also had a towing mechanism. (Gingerich dep. at 100).

Tom Siderius, the individual responsible for selling the Sportliner to Freightliner customers, testified that 70 percent of the Sportliners did not have trailering equipment installed when they were sold. (Siderius dep. at 15–16, 40). Moreover, the hand control valve that allows the driver to apply the towed vehicle's brakes independent of the towing vehicle's brakes was an option, not part of a towing package. (Siderius dep. at 55).

Because the Sportliner was sold with different options and because it is not abundantly clear whether some towing features without towing hitches is sufficient to constitute a towing package, the Court finds that there are questions that preclude a finding as a matter of law that the Sportliner was equipped with a towing package. The Court will not apply the presumption and instead will proceed to the issue of whether the Sportliner was "primarily designed" to tow a vehicle such as a trailer or semitrailer.

## B. Primarily Designed to Tow

The regulations clarify that "chiefly used" for highway transportation in combination with a trailer or semitrailer, means "primarily designed" to tow a trailer or semitrailer. The interpretation in the regulations is a reasonable one because it applies uniformly to the entire class of vehicles at the time of the first retail sale when there has not yet been any actual use of the vehicle.

Larry Gingerich was the owner of Cabriolet and was primarily responsible for the design of the Sportliner. According to Gingerich, the Sportliner grew out of the lack of vehicles that could safely pull a fifth wheel RV trailer. The trucks on the market were not heavy enough for what the RV market was building:

the market was talking—the RV market, you could hear the talk with different companies of the weight issue of the fifth-wheel trailer. And people that were going out west, especially, we're hearing stories that they would go up mountains and come down mountains and didn't have the braking capability for the weight that they were towing. And there were accidents happening because of the weight—you know, the weight of the fifth wheel trailer.... the earlier vehicles the Big Three were making were not really heavy enough for the market—for what the RV market was building. And it was getting to be kind of a problem area there. And there was a few of us builders/manufacturers that saw that and felt that we needed to address that need.

(Gingerich dep. at 117–18). Gingerich also noted that pick-up trucks with a fifth wheel had a difficult time maneuvering the 38 or 40 foot trailers. (Gingerich dep. at 25). He wanted to design something with a sharper turning radius so that the trailer could be maneuvered more easily, and that could also be used just like a pickup. (Gingerich dep. at 26). Gingerich also designed the Sportliner with more comforts, more head room, Air–Ride seats, a closet area behind the seats, a place for a TV and VCR, and a davenport that folded into a bed when needed. (Gingerich dep. at 26, 111–12, 116). Gingerich noted that the driving capabilities and comfort of the Sportliner have been compared to those of a Lincoln, Cadillac or BMW. (Gingerich dep. at 121–22). "[I]t was a supreme ride." (Gingerich dep. at 121).

Gingerich agreed that the description of Sportliners in the advertising literature as "tractors designed and used to tow house trailers to have a gross weight of less than 26,000 pounds" was accurate. (Gingerich dep. at 84–85). He also agreed that the Sportliner was a "Recreational passenger/tow vehicle" as noted on the Certificate of Origin. (Gingerich dep. at 87). Gingerich acknowledged that what Sportliners were designed to do was to tow 35–40 foot RVs. (Gingerich dep. at 92). When asked whether the vehicle was primarily designed for towing purposes he answered that "[i]t was designed for towing the fifth wheel and then for their side trips and whatever else that they were going to use it for." (Gingerich dep. at 114). At other times he testified that the Sportliner was designed for multiple purposes—to tow RV trailers or horse trailers, to provide a comfortable ride, to provide for safety and to carry things on the chassis. (Gingerich dep. at 114–16, 123–24, 143–44, 149).

Gingerich designed the Sportliner with input from Fred Pozeznik. (Gingerich dep. at 110; Pozeznik dep. at 71). Pozeznik testified that the Sportliner was Cabriolet's answer to the towing problem of the overweight trailer. (Pozeznik dep. at 70). They went from a light duty truck to a medium duty truck—took a larger chassis and converted into a safer vehicle for the towing customers. (Pozeznik dep. at 65). According to Pozeznik, the Sportliner was a towing vehicle that was not of commercial size, but it was larger than a light-duty pickup. (Pozeznik dep. at 76). When asked whether the Sportliner was manufactured mainly to tow vehicles, he responded that they "manufactured them for them to do whatever they wanted to do with them." (Pozeznik dep. at 75). Pozeznik did not consider the Sportliner a trac-

tor because he always thought of a tractor as being a full-sized commercial semi. (Pozeznik dep. at 76). He considered the Sportliner to be a hybrid of a pickup. (Pozeznik dep. at 76). "We just thought of it as a pickup on steroids." (Pozeznik dep. at 76). Nevertheless, Pozeznik agreed that what the Sportliner was really designed to do was to tow 35–40 foot RVs in the 15,000 to 22,000 pound range. (Pozeznik dep. at 89).

Tom Siderius, who was responsible for Freightliner's sale of Sportliners, testified that the Sportliner was not primarily designed to tow but primarily designed as a passenger multi-use vehicle. (Siderius dep. at 451). According to Siderius, if the Sportliner was primarily designed to tow, it would not have been designed to carry as many people or to carry as much cargo on its chassis. (Siderius dep. at 134–36). Siderius testified that Sportliners are "multi-purpose passenger vehicles. People buy them for the purpose of carrying passengers and their effects. They're person-use vehicles. They have the ability to carry cargo on their given truck chassis and they also have the ability to tow trailers." (Siderius dep. at 73). Siderius testified that most customers were "most concerned with the ride and the amenities of the vehicle"—they didn't want it to "ride like a truck." (Siderius dep. at 81). However, even Siderius went on to state that "[t]he real concern, from the industry standpoint, was that the RV builders built bigger, heavier RVs much faster than the truck manufacturers responded with appropriate vehicles that could handle those kind of trailering weights." (Siderius dep. at 73).

Sportliners are apparently very good at doing what they were designed to do. One of the Sportliner owners testified that vehicles like the Sportliner should be mandated for hauling trailers in the 38–40 foot range because pick-up trucks are not safe (Bosch dep. at 50, 54). The Sportliner owners who were deposed testified that they enjoy driving their Sportliners, with or without a trailer. (Bosch dep. at 111, Jordan dep. at 36). Nevertheless, they would not have purchased a Sportliner if they did not have a trailer to tow. (Kavanaugh dep. at 16–17; Jordan dep. at 36–37).

Timothy Sinor is a part owner of Freightliner Specialty Vehicles, Inc. Sinor purchased the mold for the Sportliner from Gingerich when Cabriolet went out of business. (Sinor dep. at 15–17, 45–56). Sinor sells the modern-day version of the Sportliner called the SportChassis to people in every walk of life, not all of whom own trailers. (Sinor dep. at 31–32). According to Sinor the bed of the SportChassis is used for a variety of purposes: welders mount their welders on them, farmers use them to haul feed sacks or hay, others use them to haul motorcycles, T-shirts, or cars. (Sinor dep. at 32).

In its Form 637, Application for Registration (For Certain Excise Tax Transactions), Cabriolet referred to the Sportliners as "custom towing vehicles." (Docket # 46, Ex. 12, Gosling decl. Appx. A). Cabriolet's sales literature extolled the Sportliner's towing capability. The literature notes that the Sportliner comes with "Cabriolet's Custom RV 5th Wheel Bed" and that typical equipment includes a "275 HP 800 lb/ft Torque Engine," a "21,500 lb. Pull Rite Hitch," and a "Reese Receiver with Electrical Outlet." Options include a "Buyer Ball Hitch." The literature also gives 15 reasons why Cabriolet RV beds are the best. (Docket # 51, Ex. B).

Although Warren Bales, a Sportliner dealer, criticized the Cabriolet marketing materials because they did not address the overall utility use which helped the customer justify making a purchase, (Bales

Cert. at ¶ 6), he did not deny that most purchasers were using the Sportliner to pull a large trailer. (Bales Cert. at ¶¶ 6–11).

The government's expert, Ronald G. Bredemeyer, CFM/D, has opined that

If it were not for the towing function, then the chassis is very overrated, as a standard production pickup costing about 1/2 as much could carry the accessory and personal property items carried in the Sportliner storage. Even the rear custom RV 5th wheel bed of the vehicle is impractical for hauling of any significant load other than the weight of the towed vehicle. The entire reason for the extra chassis capacity, brake capacity, engine torque and other medium-duty items is to accommodate the large, heave trailers it is designed to tow.

(Docket # 46, Ex. 15, Bredemeyer Report).

Upon review of the voluminous evidence presented on this issue, this Court is satisfied that although the Sportliner was designed to serve multiple purposes, there can be no question of fact that it was primarily designed to tow RV trailers. It is the towing purpose that accounts for the size of the engine, the brake capacity, the size of the fuel tanks, the size of the tires, the maneuverability and even the comfort features. That some of these features enhance the vehicle's use without a trailer, and that other features were added to enhance its use without a trailer, does not detract from its primary purpose as a vehicle to tow a trailer.

## C. Cargo

The regulations define a tractor in part as a vehicle that "does not carry cargo on the same chassis as the engine," 26 C.F.R. § 145.4051–1(e)(1)(I), whereas a truck is "a highway vehicle that is primarily designed to transport its load on the same chassis as the engine even if it is also equipped to tow a vehicle, such as a trailer or semitrailer." 26 C.F.R. § 145.4051–1(e)(2).

Freightliner takes the position that cargo means "the effects carried." (Siderius dep. at 136). The government initially argued that "cargo" means commercial goods, and because the Sportliner carries personal items rather than commercial goods, the Sportliner "does not carry cargo on the same chassis as its engine." The government subsequently changed its position and now agrees that defining cargo as "load" is more consistent with structure of the statute. The Court will proceed with the understanding that cargo means load or effects. With this understanding, the test of whether a vehicle is a truck or a tractor is whether it is primarily designed to transport its load on the same chassis as the engine or on some other chassis.

Freightliner has presented evidence that the Sportliner was designed to carry a substantial load on its chassis. The Sportliner had a 9000 pound load capacity: 22,000 pounds gross vehicle weight minus 13,000 pounds empty weight. (Siderius dep. at 135). The body of the Sportliner had enclosed compartments on the sides that had approximately 26 cubic feet of cargo-carrying capacity. (Siderius dep. at 391; Pozeznik dep. at 73). Some purchasers ordered stake pockets on the bed for rails to haul additional items, or loops put in the bed where they could tie ropes to tie things down on top of the bed. (Gingerich dep. at 127–28; Pozeznik dep. at 73). The Sportliner had 80 square feet of surface on the top of the body which, if filled to a legal maximum of 13.5 feet, gives about 80 cubic feet of carrying capacity. (Siderius dep. at 391–92). There was also room in the cab for storage or for 4 or 5 passengers. (Siderius dep. at 135). Sportliner owners would use the bed to carry motorcycles, bicycles, volleyball sets, hay, or

storage boxes. (Gingerich dep. at 127–28; Siderius dep. at 134). Pozeznik testified that Sportliner owners sometimes added compartments for lawn chairs and miscellaneous camping supplies, and would use the side compartments for tools, rugs, and things they carried along for servicing their trailer, for relaxing, or for their truck. (Pozeznik dep. at 72).

There is room for carrying cargo on the bed of the Sportliner even when towing a trailer. (Gingerich dep. at 127). However, when the trailer is attached the amount of cargo space on the bed of the Sportliner is decreased by about half. (Siderius dep. at 392–93). On occasion Cabriolet designed Sportliners with additional space so that owners could put their motorcycles behind the cab and still have their trailer. (Pozeznik dep. at 74).

As the Court has already found above, the Sportliner was primarily designed to tow large RV trailers. Only about 25% of the weight of the RV is carried on the chassis of the engine and the other 75% is carried on the chassis of the RV. (Pozeznik dep, at 89–91; Siderius dep. at 136, 316). If the Sportliner was towing a 20,000 pound trailer, 5000 pounds of that weight would be on the hitch, and the remaining 15,000 pounds would be towed on the separate chassis of the RV. There would only be 4000 of the Sportliner's 9000 pound load capacity left for cargo. (Siderius at 136).

The district court in *Horton Homes* found that the toters are not trucks because at least 75% of the weight load of the manufactured home is carried on the manufactured home's chassis and not the chassis of the toter. *Horton Homes, Inc. v. United States*, 2002 WL 31934183 at *2 (M.D.Ga.2002). The Eleventh Circuit did not disagree with the district court's finding that Horton's toters fell within the regulatory definition of "tractor." 357 F.3d at 1212.

Notwithstanding its ability to carry some cargo on its own chassis, the evidence does not support a finding that the Sportliner was primarily designed to transport its load on the same chassis as the engine. *See* 26 C.F.R. § 145.4051–1(e)(2). The primary load of the Sportliner is not the personal effects that are put in the interior cab and on the custom RV fifth wheel bed. The Sportliner's ability to tow a heavy trailer is not incidental to its design. It is the essence of the Sportliner. The weight of the towed vehicle is the Sportliner's primary load. That weight is carried not on the chassis of the Sportliner but on a separate chassis. Although many uses have been found for Sportliners over the years that may or may not involve a trailer, the Sportliner was primarily designed to tow a trailer and to carry on the chassis incidental items that would be used during travel.

The fact that a tractor carries some of its load on its own chassis does not make it a truck. To hold otherwise would render the primary design test in 26 C.F.R. § 145.4051–1(e)(1)(i) meaningless. Any tractor, despite its primary design, would be classified as a truck if there is incidental or inconsequential load carrying capacity. All tractors have the ability to carry some incidental accessories, tools and supplies on the tractor chassis. (Docket # 46, Ex. 15, Bredemeyer Report).

Because Sportliners were primarily designed to tow trailers and were not primarily designed to transport this load on the same chassis as the engine, the government has properly characterized Sportliners as tractors. Accordingly, the Court will grant the government's second motion for partial summary judgment and deny Freightliner's second motion for partial summary judgment.

An order and judgment consistent with this opinion will be entered.

### ORDER AND JUDGMENT

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Plaintiff and Counter–Defendant Freightliner of Grand Rapids, Inc.'s first and second motions for partial summary judgment (Docket # 's 33 & 50) are **DENIED.**

**IT IS FURTHER ORDERED** that Defendant and Counter–Claimant United States of America's first and second motions for partial summary judgment (Docket # 's 38 46) are **GRANTED.**

**IT IS FURTHER ORDERED** that **JUDGMENT** is entered in favor of the government that Plaintiff Freightliner's sale of each of the 40 vehicles at issue in this case was a first retail sale of a vehicle that is treated as a taxable article under 26 U.S.C. § 4051(a)(1)(E), and that the government is entitled to the unpaid balance of the assessments on these vehicles plus applicable penalties and interest.