RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WORLDWIDE EQUIPMENT, INC.,
  *Plaintiff/Counterclaim Defendant-Appellant,*

  *v.*

UNITED STATES OF AMERICA,
  *Defendant/Counterclaim Plaintiff-Appellee.*

No. 08-5950

_____

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 04-00451—David L. Bunning, District Judge.

Argued:  April 29, 2009

Decided and Filed:  May 17, 2010

Before:  MERRITT, COOK, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** James E. Burke, Jr., KEATING, MUETHING & KLEKAMP, Cincinnati, Ohio, for Appellant.  Bethany B. Hauser, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  James E. Burke, Jr., Sue A. Erhart, Brenna L. Penrose, KEATING, MUETHING & KLEKAMP, Cincinnati, Ohio, for Appellant. Bethany B. Hauser, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  Richard H.C. Clay, DINSMORE & SHOHL, Louisville, Kentucky, Emily Fritts Whitty, MORRIS & PLAYER, Louisville, Kentucky, Mark H. Sidman, Rose-Michele Nardi, Sandra B. Vipond, WEINER, BRODSKY, SIDMAN & KIDER, Washington, D.C., for Amici Curiae.

  WHITE, J., delivered the opinion of the court, in which COOK, J., joined. MERRITT, J. (pp. 19-20), delivered a separate dissenting opinion.

_____

**OPINION**

_____

HELENE N. WHITE, Circuit Judge.   Plaintiff Worldwide Equipment, Inc. (Worldwide), a heavy-truck dealer and authorized distributor of Mack Trucks, serves the coal-mining industry in Kentucky, Tennessee, West Virginia and Virginia, and is required to collect a federal retail excise tax (FRET) on the sale of certain trucks.  Worldwide filed this suit for a refund of $119,302 in heavy-truck excise taxes it paid the IRS for the first quarter of 2004, related to the sale of eight Model RD888SX coal-hauler dump trucks. Defendant Government counterclaimed for $1,149,140.59 in excise taxes claimed to be due for the period from 1999 to early 2003.  The Government sought summary judgment on both the claim and counterclaim.  The district court granted the Government's motion on both claims.  We vacate the grant of summary judgment and remand for further proceedings.

**I.**

A

Neither party challenges the district court's statement of *underlying* facts:

> Plaintiff Worldwide Equipment is a heavy truck dealer with headquarters in Prestonburg, Kentucky. (Doc. #47-1 at 2).  It has facilities and conducts business in Kentucky, West Virginia, Tennessee, and Ohio. (*Id.*)  The vehicle at issue in this case is a Mack Trucks, Inc. ("Mack") RD888SX.  By way of explaining why Worldwide is responsible for the federal excise tax imposed by the Internal Revenue Service ("IRS"), Worldwide provides:
>
> > Worldwide is a heavy truck dealer and as such, a "Form 637 filer."  This means that Worldwide purchases complete or incomplete new truck chassis from an original manufacturer, such as Mack, without paying federal excise tax.  When Worldwide sells a completed new truck or an incomplete chassis to a retail customer, it has the responsibility for determining whether the 12% excise tax is due, and if it is, charging, collecting and remitting the tax to the IRS along with a Form 720 (Federal Excise Tax Return).  While Worldwide, like most dealers, passes the excise tax on to its customers, Worldwide is the party required by law to collect the excise tax.

(Doc. #47-1 at 5 (footnotes omitted)).  With respect to the RD888SX, Plaintiff states:

> Worldwide adopted a practice of requiring its customers to sign a written statement attesting that the RD888SX Coal Hauler they were purchasing from Worldwide would be operated as an off-highway vehicle.  If the customer refused to sign this statement, or Worldwide believed that the customer intended to operate the vehicle on public highways, it collected, reported and remitted excise tax–even though the vehicle was still illegal to operate on public highways.

(Doc. #47-1 at 13 (footnote and internal citation omitted)).

The RD888SX first came to the attention of the IRS during a 1999 investigation into whether a particular Bridgestone/Firestone tire should be subject to excise tax.  (Doc. #48-2 at 14).  The IRS ultimately determined that the RD888SX was subject to excise tax.  On or before July 24, 2001, the IRS notified Plaintiff that it was opening an investigation into Plaintiff's 1999 tax returns because Plaintiff had not paid federal retail excise taxes (FRET) for certain RD888SX sales.  (Doc. #48-2 at 22).  [A footnote here states "During the relevant period (from 1999 to 2004), Plaintiff sold approximately 200 RD888SXs total.  (48-2 at 16)."]  Plaintiff argued that the IRS assessment was erroneous.  This argument was "initially rejected in 2003, and again in 2004 after plaintiff had availed itself of internal Service administrative appeal procedures."  (*Id.*).  Plaintiff paid the excise tax on eight vehicles sold to a single customer, James C. Justice Cos.  Plaintiff then filed a complaint for the refund of the FRET paid ($119,302).  Defendant filed a counterclaim for $1,149,140 for taxes assessed upon at-issue vehicles sold since 1999 [from 1999 through the first quarter of 2003, about 90 vehicles] for which no FRET had been paid.

B

The Internal Revenue Code, 26 U.S.C. § 4051(a),[1] imposes a 12% tax on the first retail sale of any heavy-truck chassis or body weighing over 33,000 pounds if the chassis or body is sold for use as a component part of a "highway vehicle." "Highway vehicle" is defined as:

> * * * any self-propelled vehicle, or any trailer or semitrailer, designed to perform a function of transporting a load over public highways, whether or not also designed to perform other functions, but does not include a vehicle described in paragraph (d)(2) of this section. . . .   [26 C.F.R. § 48.4061(a)-1(d).]

The § (d)(2) exception at issue in this case is the off-highway vehicle exception, which provides:

> **(ii)     Certain vehicles specially designed for offhighway transportation.**  A self-propelled vehicle, or a trailer or semitrailer, is not a highway vehicle if it is (A) specially designed for the primary function of transporting a particular type of load other than over the public highway in connection with a . . . mining . . . operation[] and (B) if by reason of such special design, the use of such vehicle to transport such load over the public highways is substantially limited or substantially impaired.  For purposes of applying the rule of (B) of this subdivision, account may be taken of whether the vehicle may travel at regular highway speeds, requires a special permit for highway use, is overweight, overheight or overwidth for regular use, and any other relevant considerations. . . . .  [26 C.F.R. § 48.4061(a)-1(d)(2)(ii).]

A vehicle's taxability is determined by application of an *ex ante* analysis that examines a vehicle's intended primary design.  *See Dillon Ranch Supply v. United*

---

[1]Relevant provisions of the statute (effective June 9, 1998, to August 9, 2005) provided at pertinent times:

(a) **Imposition of tax**.--

(1) **In general**.–There is hereby imposed on the first retail sale of the following articles . . . a tax of 12 percent of the amount for which the article is so sold:
* * *
    (C) Truck trailer and semitrailer chassis.
    (D) Truck trailer and semitrailer bodies.
* * *
(4) **Sale of trucks, etc., treated as sale of chassis and body.**–For purposes of this subsection, a sale of an automobile truck or truck trailer or semitrailer shall be considered to be a sale of a chassis and of a body described in paragraph (1).

*States*, 652 F.2d 873, 881 (9th Cir. 1981) (noting that "[t]he test for taxability under § 4061(a) is primary *design*, not primary use, under both the old [pre-1977] and new Treasury Regulations. . . [A] use test would be unworkable since there would be no way of knowing how a given article would be used by the consumer at the time of sale."); *see also Freightliner of Grand Rapids v. United States*, 351 F. Supp. 2d 718, 728 (W.D. Mich. 2004) (noting that "because the taxability of a vehicle [under 26 U.S.C. § 4501, *see id*. at 720 n.1] must be determined at the time of the first retail sale, an actual use standard is unworkable.")

## C

The Government's motion for summary judgment argued that the RD888SX was not specially designed for the primary function of transporting a load other than over the public highway because it was designed to be "a dual-use on/off highway vehicle," and because it was not specially designed to transport a particular type of load. The district court agreed that the exception does not apply:

> Whether the RD888SX satisfies the off-highway exception's special design test is a close call. It would seem that the vehicle's primary purpose is, indeed, the hauling of coal. However, this hauling entails transport of the coal from mine site to tipple, which often entails travel over the public highways. Thus, while specific components of the RD888SX may have been modified to improve its ability to operate in the Appalachian coal region, it does not satisfy the requirement that it be "specially designed for the primary function of transporting a particular type of load *other than over the public highway*." 26 C.F.R. § 48.4061(a)-1(d)(2)(ii(A) (emphasis added). Rather, the RD888SX's ability to transport coal over public roadways is as important to its role in the coal industry as its sturdier design features which make it better suited for work in the Appalachian coal fields. Use of the RD888SX on the public highways can hardly be considered "merely incidental," since, in most cases, one must travel over the public roads to transport coal from mine face to tipple. [Footnote 4 here states "While some mines have on-site tipples, most do not. (Pigman Decl. ¶¶ 6-7)."]
>
> * * *
>
> Taken as a whole, the record evidence suggests that the RD888SX is not a special off-highway design. Rather, it is a dual use (on/off highway) vehicle that may be licensed and that complies with applicable Federal Motor Vehicle Safety Standards . . . .

D

Worldwide raises three objections to the district court's opinion: 1) that the court failed to properly apply the summary judgment standard; 2) that the court applied an incorrect legal standard when analyzing the "special design" test, in that Worldwide need only show that the *primary function* of the RD888SX was the transport of coal off-road; and 3) that the court misconstrued several key pieces of evidence, thereby making assumptions of fact that were not supported by the record. In essence, Worldwide challenges the district court's conclusion that, as a matter of law, the RD888SX did not meet the special design prong of the off-highway vehicle exception.

This court reviews de novo a district court's grant of summary judgment. *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 795 (6th Cir. 2005). Summary judgment is properly granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Sherwin-Williams*, 403 F.3d at 795. IRS tax-liability determinations are presumed correct, and the taxpayer must prove by a preponderance of the evidence that it is entitled to a tax refund. *Sherwin-Williams*, 403 F.3d at 796.

**1.    *Dual Use Vehicles are not Disqualified under the Off-Highway Vehicle Exception***

Worldwide and amici argue that the district court incorrectly interpreted the special design prong of the off-highway vehicle exception as disqualifying dual-use vehicles. Amici National Automobile Dealers Association and various state Coal Associations relatedly assert that the district court's application of an "incidental use" standard was improper and unsupported by the plain language of the regulations. We agree with both arguments.

Clause A of the off-highway vehicle exception, the special design prong, provides that a vehicle is not a highway vehicle if it is "specially designed for the *primary* function of transporting a particular type of load other than over the public highway." 26. C.F.R. § 48.4061(a)-1(d)(2)(ii)(A) (emphasis added). The term

"primary" means first in rank of importance, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002); it does not mean exclusive. *See also Malat v. Riddle*, 383 U.S. 569, 571-72 (1966) (noting that a statute's words, including revenue acts, should be interpreted where possible in their ordinary, everyday senses, and holding that as used in 26 U.S.C. § 1221(1) of the Internal Revenue Code, "primarily" means "of first importance" or "principally").

The structure of the statute supports that the off-highway exception comes into play only with respect to vehicles that are designed, at least to some extent, for both on- and off-highway use.[2]  Various IRS general counsel memoranda[3] support that conclusion. *See* I.R.S. G.C.M. 37833, at 5 (Jan. 26, 1979) (noting that "only vehicles with no or negligible utility for transporting loads on public highways fail to meet the design test in the general definition of highway vehicle," and "[t]he exceptions are provided to exclude vehicles that should not be taxed, but which meet the design test"); *see also* I.R.S. G.C.M. 39530 (July 16, 1986) (noting that "only vehicles with no or negligible highway capabilities fail to come within the general definition of a 'highway vehicle', and because [the truck at issue] can function as a highway vehicle it is subject to excise tax . . . unless it is exempt" under one of the exceptions.).

Further, when read as a whole, the off-highway exception clearly contemplates that highway use may occur, in that Clause B of the exception states "if by reason of such special design, the use of such vehicle to transport such load over the *public highways* is substantially limited or substantially impaired." 26 C.F.R. § 48.4061(a)-1(d)(2)(ii)(B) (emphasis added).

---

[2]If a vehicle is not designed for highway use, it would fall outside the regulatory definition of a highway vehicle and would not be subject to the 12% excise tax.

[3]IRS General counsel memoranda are entitled to some deference, although they do not have the force of law because they have not been subject to notice and comment. *See Schlumberger Tech. Corp. and Subsidiaries v. United States*, 55 Fed. Cl. 203, 212 n.5 (2003).

**2.**     ***The Primary Function Standard of § 48.4061(a)-1 Permits More than Incidental Highway Use***

The district court concluded that "[r]egardless of whether Plaintiff's or Defendant's version of highway usage is accepted, the record does not support Plaintiff's position that the RD888SX's use on public highways is merely incidental."

Although the court understandably applied an "incidental" use standard to the special design prong of the off-highway exception, given that the parties argued it, that standard no longer applies under current regulations.[4] The term "incidental" is defined as "[s]ubordinate to something of greater importance; having a minor role." BLACK'S LAW DICTIONARY (8th ed. 2004). However, the proper standard for application of the off-highway-vehicle exception special design prong is not whether highway use is incidental or subordinate to off-highway use, but rather, whether the vehicle was designed for the primary function of transporting loads other than over a public highway. *See* 26 C.F.R. § 48.4061(a)-1(d)(2)(ii). The primary function standard permits more than incidental highway use. *See e.g., GLB Enterprises, Inc. v. United States*, 232 F.3d 965, 967-68 (8th Cir. 2000). Highway use that is more than incidental does not necessarily mean the truck was not designed primarily for off-highway use. *See Halliburton Co. v. United States*, 611 F. Supp. 1118, 1121-22, 1127 (N.D. Tex. 1985) (noting that trucks that were primarily designed as off-highway vehicles were not subject to excise tax simply because of their use on public highways as necessary to get to the job sites); *see also GLB Enterprises*, 232 F.3d at 967-68.

We relatedly conclude that the district court erroneously considered evidence of presumed use instead of focusing on the objective design of the vehicle. The district court noted the proper standard – an *ex ante* analysis that examines a vehicle's primary design, *see Dillon Ranch Supply*, 652 F.2d at 881 (noting that "[t]he test for taxability under § 4061(a)(1) is primary design, not primary use, under both the old and new

---

[4]We note that although the "incidental use" standard is not part of current regulations and apparently originated in the pre-1977 regulations, *see Liquid Asphalt Systems, Inc. v. United States*, 555 F. Supp. 1100, 1102-03 (W.D. Mo. 1982), some courts continue to consider evidence regarding whether highway use of the vehicle at issue is "incidental." *See, e.g., Gateway Equip. Corp. v. United States*, 247 F. Supp. 2d 299, 308 (W.D. NY 2003).

Treasury Regulations . . . [A] use test would be unworkable since there would be no way of knowing how a given article would be used by the consumer at the time of sale.") However, after citing the proper standard, the court considered evidence of highway use (the IRS 1999 and 2006 surveys[5]) and intended use (the fact that Worldwide collected taxes on certain RD888SX's sold to customers who planned public highway use). The court's inquiry should have been limited to the pre-sale intent and objective design of the vehicle itself.

In addition, the district court credited only the Government's interpretation of the evidence when it found that Worldwide "admits the RD888SX was designed to transport coal from mine site to tipple–a purpose often necessitating use of the public roads." The evidence Worldwide submitted below supported that the RD888SX's primary design function was for *off-highway* transport from mine face to tipple.

Rather than focusing on whether a question of material fact existed, the court improperly credited only IRS expert Pigman's affidavit, which stated in pertinent part:

> 6. It is true that some mine facilities are large enough, and expected to have a long enough productive lifetime, in order to justify construction of a tipple on the mine property itself. However, most mines in Kentucky have not been of that scale (or have been located in areas inaccessible to rail or barge transportation) with the result that tipples have generally not been located on the mine property itself.

Based on Pigman's general statement that most mines in Kentucky have not been of a large enough scale to justify an on-site tipple, the district court concluded that "some mines have on-site tipples, most do not," and that one must travel over public roads to transport coal from mine face to tipple. The district court concluded that the RD888SX must have been designed to travel on public highways and, therefore, that it fails the "special design" test.

---

[5]The survey data the Government relied on, and which our dissenting colleague believes supports the Government under the off-highway exception's Clause B (substantial impairment), showed that some RD888SX coal haulers operated over Kentucky public highways during the three-day survey periods in 1999 and 2006, and that the RD888SX trucks looked similar to standard dump trucks. The Government's evidence had nothing to do with the design of the RD888SX or its primary function and, as noted *infra*, the district court did not reach Clause B and the Government on appeal does not request that we do so.

We note that expert witnesses cannot create a question of fact by simply stating conclusions on ultimate issues. A court is free to reject an argument as having no factual basis. However, as discussed below, Worldwide presented extensive evidence demonstrating the existence of a factual dispute regarding whether the RD888SX was designed for the primary function of transporting coal other than over the public highways. Under these circumstances, the district court was not free to simply credit the Government's submissions, i.e., weigh the evidence and determine the truth of the matter. Rather, the court's function was to determine whether there was a genuine issue for trial. *See Doe v. Metropolitan Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998) (noting that weighing the evidence "is never appropriate at the summary judgment stage.")

Worldwide does not dispute that the RD888SX coal hauler is physically capable of being driven on the highway and is sometimes driven on public highways. Nonetheless, Worldwide introduced extensive evidence regarding the special design features of both the chassis (the Mack RD888SX) and the bodies incorporated into the RD888SX coal hauler. This evidence included the affidavit of Terry Dotson, Chief Executive Officer, President and Chairman of Worldwide Equipment, which stated in pertinent part:

> 2. Worldwide is a heavy truck dealer headquartered in Prestonburg, Kentucky, and an authorized dealer for new Mack, Volvo . . . and GMC trucks. . . . Worldwide was founded as a Mack dealer.
>
> 3. A significant portion of Worldwide's business is selling and servicing heavy trucks for the coal mining industry in Eastern Kentucky, West Virginia, Virginia and, to a lesser extent, Tennessee.
>
> 4. Mack is a custom truck builder that manufactures and sells trucks . . . . Every Mack truck is a custom designed and custom engineered truck. Worldwide, working with its retail customers, custom orders each truck it buys from Mack ***according to the specific application for which the truck is being purchased***.
>
> * * *
>
> 6. From the time I joined the company in 1972 until sometime in the mid-1980's, Worldwide would typically recommend and custom order a

specially designed and configured version of a Mack Model DM800 series truck for customers who said they wanted a rugged off-road dump truck to haul coal in the coal fields in the area.

7. Mack designated the unique combination of special design and configuration features for the off-highway coal hauling dump version of the DM800 series ordered by Worldwide as the "DMC800" sometime in 1980. The "C" stood for "Coal." Prior to Mack's use of this model designation, Worldwide would order a DML800 for its off-road coal hauling customers. The DML800 had the same unique special design and configuration features as the DMC800. The "L" stood for "Logging." However, the intended use of the DML800 trucks ordered by Worldwide was for hauling coal and an oversized dump bed was added to the truck.

\* \* \*

9. Sometime in late 1982 or early 1983, I learned that Mack was going to stop building the DMC800 . . . .

10. Based upon years of working closely with Worldwide's customers involved in the coal mining industry, I knew that they had a need for a rugged dump truck designed and configured for operating off-road in the conditions typical to the region: A vehicle that could survive in the hilly, muddy, rocky, gravelly Appalachian coal fields and still provide an economically viable method to transport coal from the extraction point (the mine face) to the tipple or processing area.

11. In late 1982 or early 1983, I learned about the RD800 series trucks that Mack was just beginning to manufacture for the Canadian logging industry. After seeing the basic specifications for this new series, I personally approached Mack and asked whether the RD800 base platform could be designed and configured so that it would be suitable for use as an off-road coal hauling dump truck–a suitable replacement for the DMC800.

\* \* \*

13. Worldwide, in collaboration with Mack and its coal field customers, helped to develop the specifications for the specially configured RD800 truck that became known as the RD888SX Coal Hauler. The paperwork on every RD888SX Coal Hauler ordered by Worldwide stated that the vehicle was intended to be used as severe service "off-highway" coal hauler.

14. The RD888SX Coal Hauler was a direct successor to the DMC800 and shared many of the same design features, including a 65,000 lb. bogie, heavy duty triple rail frames and associated frame and suspension

components; a special engine, transmission and rear axle combination; an oversized steel dump body; and special off-road Goodyear tires. The RD888SX Coal Hauler was designed and sold to the same customers for the same exact purpose as the DMC800–off-road coal hauling.

15. The typical RD888SX Coal Hauler sold by Worldwide had more than $27,000 in customizations as compared to the standard RD800 SX truck, or a price increase of approximately 25%. Attached hereto as Exhibit A is a specification comparison of the RD800 SX "standard" truck and the RD888SX Coal Hauler.

* * *

17. The RD888SX Coal Hauler was a custom designed and configured truck built for a special purpose. It was wider, taller, longer, heavier, slower and significantly more expensive to purchase and operate than general purpose heavy duty dump trucks manufactured by Mack and several other manufacturers which were intended for highway use. It was built for the primary purpose of off-highway use. Attached hereto as Exhibit B is a copy of a January 9, 2003 letter where Mack confirms the RD888SX Coal Hauler's intended purpose.

18. The RD888SX Coal Hauler shared the same fundamental modifications that distinguished the DMC800 trucks as off-road and qualified them for tax exempt status: A 65,000 lb. bogie; heavy duty triple rail frames and associated frame and suspension components; a special engine, transmission and rear axle combination; an oversized steel dump body; and special off-road Goodyear tires.

19. In the majority of situations, Worldwide would take delivery of an incomplete RD888SX chassis from Mack and subcontract with a custom dump bed manufacturer to affix a dump bed to the chassis to make a complete truck. On rare occasions, Worldwide's customer wanted to complete the vehicle by affixing a dump bed or other equipment to the chassis on its own or through a subcontractor of its choice.

20. Every RD888SX Coal Hauler sold by Worldwide from April 1, 1999 through March 31, 2004 was at least 104.4 inches wide at the rear bogie (as measured from tire to tire), and the majority of those trucks were sold with dump beds that exceeded 102 inches in width. It is important to note that this width measurement is based on an empty truck. When the truck is loaded, the tires flatten out and the width of the vehicle increases as much as 2 inches or more.

21. The maximum allowed width for vehicles using public highways in the United States is 102 inches–except Hawaii is 108 inches, and Connecticut is 102.36 inches. Worldwide never sold an RD888SX Coal Hauler for use in Hawaii or Connecticut. Further, there are many public

roads on which the maximum width is just 96 inches. Attached hereto as Exhibit C is a copy of a July 1, 2002 list prepared by J.J. Keller and Associates, Inc., which shows maximum vehicle sizes and weights for all states. This is a document that Worldwide uses in its business.

22. The custom specifications of the RD888SX Coal Hauler prevent it from being driven at regular highway speeds. Although the "maximum geared road speed" of this truck is listed by Mack as approximately 45 MPH, it is virtually impossible to sustain that speed for any length of time because to do so would require the engine to operate at its maximum governed RPM rating. In addition, if the RD888SX Coal Hauler is operated for any length of time at or above 35-40 MPH, the rear transaxles will overheat due to the very low gear ratios (a low gear ratio means that the rear transaxles must turn 7.58 times for each revolution of the rear wheels). If the rear transaxles are overheated for any length of time, the lubricant will "coke" and the gears will be burned out. Furthermore, if an RD888SX Coal Hauler is operated for any length of time at or above 35-40 MPH, the special off-road Goodyear tires will overheat and suffer tread separation or even catastrophic tire failure (a blowout), a problem that is exacerbated if the truck is hauling a heavy load.

\* \* \*

26. The RD888SX Coal Hauler cannot legally be operated on the highway without a special permit due to its excessive width and/or weight . . . .

27. To justify the premium cost for an RD888SX Coal Hauler, an owner/operator must fully load the truck for its operation to be economically feasible. A fully loaded RD888SX Coal Hauler often weighs in excess of 100,000 pounds (41,000 lbs. empty weight). But if used on public highways, the RD888SX Coal Hauler would only be able to legally haul a fraction of its rated or actual load capacity. It is not economically feasible for the RD888SX Coal Hauler to be used for the primary purpose of transporting loads over public highways.

28. Mack halted production of the RD888SX Coal Hauler in 2004.

\* \* \*

30. Less than 1,315 RD888SX Coal Hauler trucks were built by Mack Truck during the entire 20 plus year production run. Of this number, Worldwide purchased all but about 50.

\* \* \*

32. An owner/operator could modify an RD888SX Coal Hauler to make it highway legal, but I've never known anyone to do this. The truck would have to be totally reconfigured. At a minimum, the 65,000 lb. bogie and all the wheels, spacers and tires would have to be replaced, the custom dump bed would have to be replaced, and the chassis would have to be reconfigured. . . . [Emphasis added.]

Additional evidence Worldwide presented on the special design prong of the off-highway exception included the affidavit of Bruce Hollenbeck, Mack Truck Vice President of Product Planning, and an employee of Mack Truck since 1971, stating in pertinent part:

4. Mack has historically used the terms "Highway (On Road) Vehicles," "On/Off Highway Vehicles, and "Off Highway (Off Road) Vehicles" to describe the different categories or types of vehicles it has designed and manufactured over the years. However, Mack's internal terminology . . . had nothing whatsoever to do with whether particular vehicles could be licensed or whether federal excise tax was applicable to the sale of particular vehicles.

5. From 1977 to 1983, I was the program manager responsible for the development of the RD800 series of Mack trucks. One of the variants of the RD800 series was the RD888SX model. As such, I am very familiar with the development of the RD800 series and the RD888SX variant of that series.

6. The RD800 series, including the RD888SX variant, was purposely designed so that, depending on the specifications required by the customer, the vehicles could operate off-highway, on-highway or both. Customer specifications are generally driven by the customer's intended vehicle application–in other words, how the customer intends to use the truck.

7. The two vocational applications for which the RD800 series was originally designed were (1) logging (hauling logs both off and on paved surfaces), and (2), oil field operations (hauling very heavy oil field equipment both off and on paved surfaces).

8. Coal hauling was not one of the original applications for which the RD800 series was designed. However, after the RD800 series had been put in production, it was determined in approximately 1983 that RD800 chassis could be configured in such a way that would be suitable for coal hauling (both off and on paved surfaces).

9. The RD800 series was a very low volume product for Mack.

10. I have carefully examined pages 3793 through 3803 of "Mack Exhibit 13" to my deposition (January 8, 2007). These pages relate to the specifications for 8 RD888SX trucks (Serial No. 2189 through 2196) ordered by Worldwide Equipment in April 1998. Based upon my review of those specifications, I would classify those 8 vehicles as "Off Highway Vehicles." I base this statement on the fact that the customer's stated application or intended use of these vehicles was "Class D Off Road" for "Mining." I also note that these vehicles were ordered with heavy duty tandem rear axles (referred to as "bogies") rated at 65,000 pounds, and 12.00R24 Goodyear tires, which would result in a vehicle that was at least 104.4 inches wide. It is my understanding that the maximum legal width for vehicles traveling on public roads in the United States is either 96 inches or 102 inches, depending on the type of road.

11. Similarly, I have carefully examined pages 5108 through 5112 of "Mack Exhibit 5" to my deposition (January 8, 2007). These pages are part of a Mack document called an "Invoice Detail/Vehicle Specification" and relate to the specifications for 5 RD888SX trucks (Serial Nos. 2240 through 2244) ordered by Worldwide Equipment in March 1999. Based upon my review of those specifications, I would classify those 5 vehicles as "Off Highway Vehicles." I base this statement on the fact that the customer's stated application or intended use of these vehicles was "Class D Off Road" for "Mining." I also note that these vehicles were ordered with the heavy duty 65,000 lb. bogies and 12.00R24 Goodyear tires, which would result in a vehicle that was at least 104.4 inches wide. It is my understanding that the maximum legal width for vehicles traveling on public roads in the United States is either 96 inches or 102 inches, depending on the type of road.

Worldwide also submitted the affidavit of Al Campbell, Goodyear representative for the Mack Truck account, stating that the G177 tire with which the 8 RD888SX coal haulers were equipped was the functional equivalent and substantially the same as the Bridgestone/Firestone L317. The Bridgestone L317 tire was judicially determined to be an excise-tax exempt specially designed off-road tire in *Bridgestone/Firestone Am. Holding, Inc. v. United States*, 2006 WL 724561, at *8 (M.D. Tenn. Mar. 22, 2006) (unreported disposition).

Additional evidence Worldwide submitted below supporting that the RD888SX was primarily designed for off-highway use included the report of Worldwide's Engineer Expert, Frank Entwisle, which summarized his findings in pertinent part:

OBJECT

Determination of the suitability of the subject trucks for public highway usage.

CONCLUSION

Due to the dimensional configuration and inclusion of specific severe components, the specially designed Mack RD888SX coal trucks are not suitable for highway use, and in fact, are in violation of Federal and State laws applicable to highway vehicles.

Specific components at issue include the cargo body, rear axle, drive train, and tires. The combination of these components results in vehicles which have speed capability at maximum engine RPM rating of approximately 45 mph.

The above issues substantially impair the use of the trucks to operate on public highways.

* * *

It is my opinion to a reasonable degree of engineering certainty that the Mack model RD888SX is specially designed for a vocation as an off-highway coal hauling vehicle and the very design features which suit it for that vocation, substantially impair the ability of the truck to operate on public highways. The basis for this opinion includes my education, training, and work experience as reflected in my attached Curriculum Vitae as well as review and study of the materials identified in this Report.

Additionally, Worldwide submitted affidavits of 14 RD888SX owners/operators, who had purchased 98 of the coal haulers between 1998 and 2004, stating that highway use was limited to about 5% or less of total operational time.

E

The evidence Worldwide submitted below supports that, by design, the RD888SX's primary function is to haul coal off-highway. Worldwide did not "admit" that the RD888SX design to transport coal from mine site to tipple "often necessitated use of the public roads." Rather, Worldwide presented documentary evidence, including affidavits of RD888SX owners/operators, who averred that the vast majority of the trucks' functional time was spent off-highway, and that highway use accounted for

approximately 5% of their time.  The Government was not entitled to summary disposition on the basis of its argument that the RD888SX's primary function was dual use.

## II. *Discussion of Cases on which the District Court Relied*

Amici National Auto Dealers Association and various state coal associations argue that the district court cited only one case, *Florida Power & Light Co. v. United States*, 56 Fed. Cl. 328 (2003), in support of using the highway mileage threshold to disqualify a vehicle from satisfying the special design prong (Clause A) of the exception, and that reliance on that case was misplaced.  We agree.  The court in *Florida Power* referred to the annual number of highway miles in its analysis of the substantial limitation or impairment (Clause B) of the off-highway exception, not Clause A.  56 Fed. Cl. at 333.  In the instant case, the district court never reached Clause B, finding instead that the exception did not apply because the RD888SX coal hauler did not satisfy Clause A.  We conclude that the district court erroneously relied on *Florida Power*.

The district court also followed *Liquid Asphalt Systems, supra*, which it found "persuasive."  The *Liquid Asphalt* court concluded that the off-highway vehicle exception did not apply because "transporting a load over the public highway is an important part of the design and use of plaintiff's job tankers."  555 F. Supp. at 1104-05. *Liquid Asphalt* is of limited application for several reasons.  First, the decision followed a trial, not a motion for summary judgment.  *Id.* at 1101.  Second, unlike in *Liquid Asphalt,* no evidence was submitted in the instant case that highway transport was an important part of the RD888SX's design.  Further, the asphalt tankers at issue in *Liquid Asphalt* did not require a special permit to operate on the highway and were licensed as normal vehicles, *id*. at 1103, unlike the RD888SX, which requires a special permit.

A

Having concluded as a matter of law that the RD888SX was not specially designed for the primary function of transporting coal other than over the public highway (Clause A of the off-highway exception), the district court did not reach the substantial

impairment prong (Clause B).  Our dissenting colleague  notes that at oral argument Worldwide limited our focus to Clause A and caused us to ignore Clause B.  That is not the case.  The Government has not requested that we consider and rule on Clause B; its appellate brief states that in the event this court were to hold that summary judgment in its favor was not warranted on the issue whether the trucks satisfy Clause A, the case should be remanded for a trial on that issue and, if then necessary, for a determination whether the trucks meet the additional requirement set forth in Clause B.  Def.'s Br. 57 n.10.

We VACATE the district court's grant of summary judgment to the Government on both the claim and counterclaim, and REMAND for further proceedings.

_____

**DISSENT**

_____

MERRITT, Circuit Judge, dissenting.   This should be an easy case.   The defendant-appellant, Worldwide Equipment Inc., is a heavy truck dealer that supplies coal hauler dump trucks to coal mining companies in the Appalachian region.   The companies use the trucks to haul coal from mine face to tipple, a process which almost always involves travel over the Interstate and other roads.   For this reason, the government claims that Worldwide must pay a 12% excise tax on the sale of its trucks under 26 U.S.C. § 4051.   The tax applies to "heavy trucks" (trucks over 33,000 pounds) because of the special damage that they cause to public roadways.

Whether Worldwide is subject to the excise tax turns on whether its trucks fall under an exception to the tax for off-highway vehicles.   To qualify, a vehicle must be (1) "*specially designed* for the *primary function* of transporting a particular type of load other than over the public highway," and (2) "by reason of such special design, the use of such vehicle to transport such load over the public highways [must be] *substantially impaired*."   26 C.F.R. § 4061(d)(2)(ii) (emphasis added).

Worldwide persuaded the majority that it fell under the exception by slight of hand.   During oral argument, its attorney limited the Court's focus to whether the trucks at issue were specially designed for the primary function of hauling coal off-highway and, as result, caused the Court to ignore the second factor, which considers whether (by reason of such design) they were substantially impaired from traveling over public roads.   Although there is a strong argument that the trucks were not specially designed for the primary function of off-road use, this question is a little closer than whether the trucks were impaired from traveling over public roads.   That the trucks were *not* substantially impaired from using public roads was clearly established by facts in the record which detailed routine use of the Interstate by Worldwide trucks transporting coal from face to tipple.   An expert civil engineer testified that most coal mines in the Appalachian region are too small to justify an on-site tipple such that a central tipple often serves

multiple small mine faces in a region, and that travel to the tipple in this scenario necessitates highway use. This theory was supported by data collected by the IRS and Kentucky Vehicle Enforcement officer in 1999 and 2006 documenting routine highway use by coal trucks (including Worldwide's model) in transporting coal from face to tipple. In view of such facts, it is impossible to conclude that the truck at issue is substantially impaired from travel over public highways. Therefore, on this fact alone, the Court cannot conclude that the truck falls under the exception. Under this statute, the law does not require general taxpayers to subsidize all the costs of large, commercial trucks hauling heavy loads that tear up the country's roads between the coal mine and points of further distribution.

Beyond the question of substantial impairment, there is also strong support for the proposition that the trucks were *not* primarily designed for off-highway use, but instead for the more general road use of getting coal from face to tipple which contemplates the dual function of driving off-road in and around the mine face *and* traveling on public roadways to get the coal to tipple. A coal truck incapable of traveling on public roads would, in most cases, be unable to get coal from face to tipple and would therefore serve no purpose.