NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0323n.06

No. 10-1672

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHARLES E. KING, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| PENNSYLVANIA LIFE INSURANCE CO., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) | |

Before:     KEITH, GRIFFIN, and STRANCH, Circuit Judges.

PER CURIAM.  Plaintiff-Appellant Dr. Charles E. King appeals from the district court order granting the summary-judgment motion brought by Defendant-Appellee Pennsylvania Life Insurance Co. ("Penn Life") and dismissing King's complaint.  King alleges that Penn Life (as successor-in-interest to Massachusetts Indemnity and Life Insurance Company, or "Mass Life") improperly terminated payments owed to him under a disability insurance policy because his stroke-induced disability was caused by "accidental bodily injury" and not "sickness."  Penn Life maintains that King's benefits terminated when he turned 65 because his disability was caused by sickness.  Because we find that there are genuine issues of material fact in dispute, we **REVERSE** the district court's judgment and **REMAND** the case for further proceedings consistent with this opinion.

I.

This case is an insurance-coverage dispute.  At the time of the events that undergird this lawsuit, Dr. King was a practicing osteopathic surgeon residing in the Flint, Michigan area.  On

November 23, 1976, when King was 35 years old, Mass Life issued to King a disability-income insurance policy that would provide him with coverage "in the event of disability which *results from accidental bodily injury* sustained while this policy is in force or in the event of disability which *results from sickness* which first manifests itself while this policy is in force."  (emphases added). King had to describe his medical history on the insurance application, and on the family history portion, King listed that his father died of a stroke at age 48.  Under the policy, the term "total disability" means "complete inability to engage in the Insured's regular occupation."  The policy does not define the terms "accidental bodily injury" or "sickness."  Under the policy, in the event King became disabled he would receive monthly benefits for a certain period of time, the length of which depended on the cause of his disability.  If his disability was the result of "accidental bodily injury," he would receive benefits for the rest of his life; if his disability resulted from "sickness," however, he would only receive benefits until he turned 65 years old.  The actual cause of King's disability is at the heart of this case.

On December 8, 1977, King "fell in the snow" while he was skiing in Alta, Utah with his friend and fellow physician, Dr. John L. Schriner.  Dr. Schriner examined King on the ski slope after he fell and noted that King "did not seem to be injured."  King reportedly "noted some numbness in [his] right upper extremities" that lasted for 15-20 minutes after he fell.  The next day, on December 9, 1977, King suffered a stroke (in medical parlance, a cerebral vascular accident) while riding up the chair lift.  He was brought to a local hospital and was examined by Dr. Wayne M. Hebertson, who noted that King had developed a "marked paralysis involving the right face, arm, and leg."  Dr. Hebertson's report states that a "CT scan was done revealing a small lesion in the

region of the left insula." The report concluded that King had suffered "Acute intracerebral bleeding on the left, cause undetermined."

After several days in the hospital, King returned home to Michigan and was examined by Dr. Gary W. Roat on December 22, 1977, who determined that King had suffered an "intracerebral hemorrhage" and was totally disabled as a result. There is some dispute surrounding the physician's report from this examination. The form for the report included spaces marked "Due to sickness?" and "Due to accident?" that could be filled out. Dr. Roat wrote "see above" [referring to his diagnosis description] in the spaced marked "Due to sickness?" The space marked "Due to accident?" has a line drawn through it. It is not clear who drew a line through the "accident" section. King maintains that a representative from Mass life drew the line before giving it to Dr. Roat, while Penn Life assumes that Dr. Roat drew the line himself.

This physician's report was attached to King's "Statement of Claim" form, which he filled out and submitted to Mass Life on January 6, 1978 so that he could collect disability benefits. That form contains two sections particularly relevant here: one to be completed "IF DISABILITY DUE TO SICKNESS" and another to be completed "IF DISABILITY DUE TO ACCIDENT." (emphases in original). The former section on the form (the sickness section) is filled out, with "Sickness" typed in as the "Nature of illness" and "12/9/77" listed as the "Date of first symptoms." The latter section (the accident section) is crossed out by hand and is blank. King maintains that a representative of Mass Life crossed out the "accident" section before King received the form and filled it out.

After receiving King's Statement of Claim, Mass Life began paying a monthly disability benefit of $2,500 because King was totally disabled. (Eventually, King was able to resume the practice of medicine as a radiologist, but he was never able to perform surgery because of his limited use of his right hand.) In July 1978 King wrote to Mass Life to provide an update on his disability and the prospects of resuming his "regular occupation" as a surgeon. In that letter, King stated:

> As you know, I am receiving disability benefits from your company since suffering a stroke in December of 1977.
>
> Previous to my illness, I was a practicing general surgeon, performing major surgical procedures five to seven days per week. For six months following my illness, I was unable to do any type of work . . . .

After it started paying benefits, Mass Life conducted further investigation into King's disability. Mass Life agent Jack Rayner visited King on November 2, 1978, and sent a report to Mass Life representative Mick Orend on November 10 noting that King had fallen in the snow the day before his stroke was diagnosed, that King had "felt some discomfort in his arm and shoulder" after he fell, and that Dr. Schriner "was the only physician involved prior to the hospital [in Utah]." Rayner also noted that an angiogram (presumably conducted at the hospital in Utah) "showed an A.V. [arteriovenous] malformation."[1] Following up on Rayner's report, Mass Life asked Dr. Schriner for a narrative description of his observations while skiing with King on December 8 and 9, 1977, and Dr. Schriner responded with a letter dated March 12, 1979. That letter referred to King's "injuries" suffered in connection with an "accident," stating, "Prior to his injury he was

---

[1] An arteriovenous malformation ("AVM") is an "abnormal tangle of blood vessels." In an AVM, blood passes directly from arteries to veins instead of passing through capillaries. The blood vessels in an AVM can rupture, causing bleeding into the surrounding area. http://www.mayoclinic.org/arteriovenous-malformation/ (last visited March 22, 2012).

assumed to be in excellent health and he and I had been skiing for at least one to two days prior to

the accident." In a subsequent memorandum to the file dated April 16, 1979, Orend wrote the

following:

> Larry Cattani [another Mass Life official] & I discussed this file. We agreed that
> even if there were a question of accident vs. sickness—which there doesn't appear
> to be—that question is not particularly pressing, since benefits are payable for
> sickness to age 65 for qualifying claims (2006 in this case).

> Larry suggested [another doctor] review the case re: when and if we need an IME.

Around the same time, Mass Life agents met with King to get his authorization to access the

ski-patrol reports for its investigation. The notes from that interview state that King disagreed with

the wording in the authorization form that referred to his stroke as a "skiing accident," saying that

"there wasn't actually an accident involved." Accordingly, Mass Life "changed the word accident

to incident." King "reviewed the authorization as [Mass Life] had corrected it, signed and dated the

authorization."

Mass Life's investigation continued. A Mass Life "Claim Department Medical Referral

Form" dated April 17, 1979 noted that Dr. Schriner's use of the word "injury" could be "very

significant" and that its use in the letter was a "little bit out of context," and recommended clarifying

"the meaning of injury as used by Dr. Schriner." Accordingly, on June 25, 1979, Dr. Rodney

Larcom from Mass Life wrote to Dr. Schriner asking him to clarify the "double reference to injury"

in his narrative description. The letter continued:

> In our file we have information from the Ski Patrol, complete hospital records, and
> our field representative's personal report and repeated reports from his attending
> physician. In none of these is there mentioned any specific positive relationship to

> trauma as a basis for his condition.  There is a mention of cerebral insult and I
> wonder if this is the context of your reference to injury; i.e. cellular injury.

Dr. Schriner responded in a letter dated July 16, 1979: "I consider his vascular accident was an injury to his brain, and I am not in any way reflecting that this was a result of trauma.  In reality, there was no trauma involved in his vascular accident."  King continued receiving monthly benefits.

On or around August 21, 1987, King requested that Mass Life send him a letter describing his disability benefits that he could give to a loan officer.  Mass Life agreed and sent him a letter dated the same day that stated: "Please let this letter serve to confirm that the monthly disability benefit of your policy is $2,500.00, and that those benefits will continue until your 65th birthday."

Penn Life (which acquired Mass Life at some later point), continued to pay King's benefits until May 2006, at which point it sent King a letter notifying him that his "monthly benefits should have ceased on 3/27/06," King's 65th birthday.  The letter stated: "Your policy provides benefits when Sickness results in Total Disability.  The monthly income under this provision of your policy is payable until your 65th birthday."

In June 2006 King's attorney sent a letter to Penn Life disputing the stoppage of benefits. The letter stated that King had "suffered an accident while skiing (hit a tree) in December of 1977. The following day, as a result of this accident, he developed a brain hemorrhage resulting in a stroke."  The letter stated further that "Charles King's hemorrhage resulted from the accident, and as a result, the policy benefits allow him lifetime disability."  Penn Life responded by letter that it "respectfully decline[d] to consider a revised version of the underlying facts of this case at this late date."  The parties exchanged similar letters in August 2008.

King filed this lawsuit in 2009, and Penn Life filed for summary judgment shortly after answering the complaint. Penn Life argued that there was no dispute that King's disability was caused by sickness (i.e., the stroke that occurred on December 9, 1977), and that it was entitled to summary judgment because it was clear under the policy that the benefits King had received for his sickness-related disability should have terminated when King turned 65. Opposing the motion, King argued that there was a genuine issue of material fact regarding whether his disability resulted from "accidental bodily injury" or "sickness," rendering summary judgment inappropriate. In support, King offered the affidavit of Dr. Christopher Sweet, a neuro-radiologist who offered his opinion regarding the cause of King's disability. In his affidavit, Dr. Sweet stated that he had "reviewed the Complaint . . . along with CT scans and St. Marks medical records pertaining to Dr. King's 1977 skiing accident . . . including the December 9, 1977, CT scans." The substance of the affidavit stated:

> [B]ased upon the information provided to me, as above-described, as well as upon my years of education, training, and experience, it is my professional medical opinion that the cerebral vascular accident suffered by Dr. King in December 1977, first manifested itself on December 8, 1977, after he fell in the snow and immediately experienced numbness in his right upper extremity, lasting for approximately 15-20 minutes.
>
> [I]t is my further opinion that Dr. King's brain injury, which I believe consisted of a deep bleed in the small vessels, later became fully manifest when, on December 9, 1977, Dr. King began to exhibit right facial paralysis, right upper extremity paralysis, weakness and numbness, and related symptomatology.
>
> [I]t is my further opinion that, since Dr. King did not, prior to December 8, 1977, have any underlying symptoms or signs of an impending stroke, (e.g., blood disorders such as "Factor V," any blood thinning disorder, diabetes, renal insufficiency, congestive heart failure, hypertension, or headaches), Dr. King's brain injury was an unanticipated, sudden, spontaneous vascular accident that, based upon reasonable

medical probability, occurred due to a combination of (a). Dr. King's December 8, 1977, neurological-symptoms producing fall in the snow, (b). The very high altitude at which said fall in the snow occurred, and (c). a deep bleed in the small vessels on the left side of Dr. King's brain.

The magistrate judge recommended that the motion for summary judgment be granted, finding that King had not offered enough evidence for a reasonable jury to find for him. The district judge adopted that recommendation, granting the summary-judgment motion and dismissing the complaint. This appeal followed.

## II.

## A.

We review a district court's grant of a motion for summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the non-moving party—in this case, King. *Ireland v. Tunis*, 113 F.3d 1435, 1440 (6th Cir. 1997). Summary judgment is proper if, after viewing the evidence that way, there are no genuine issues of material fact, entitling the moving party to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56. The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). For its part, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. It must provide "significant probative evidence" to defeat a properly supported summary-judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, we must decide whether there is enough evidence for a jury to decide for the non-movant before denying a summary-judgment motion. *See id.* at 252.

B.

The cause of King's stroke and ensuing disability is the heart of this case because there is no dispute that King became disabled after he suffered a stroke. The main issue is whether, for purposes of the policy, the disability-inducing stroke was caused by "sickness" or by "accidental bodily injury." As an initial matter, then, we must determine what the term "accidental bodily injury" means in the context of King's disability insurance policy. The policy itself does not define the term, and so we must look elsewhere. When interpreting a contract in a diversity case, we apply the law of the forum state—in this case, Michigan, *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008), and the Michigan Supreme Court is authoritative on questions of Michigan law, *Prestige Cas. Co. v. Michigan Mut. Ins. Co.*, 99 F.3d 1340, 1348 (6th Cir. 1996). When interpreting an insurance policy under Michigan law, then, we employ traditional principles of contract interpretation, *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999), keeping in mind that the "insurance contract must be enforced in accordance with its terms," *Henderson v. State Farm*, 596 N.W.2d 190, 193 (Mich. 1999). A provision is ambiguous if it is "susceptible to two different reasonable interpretations." *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993). In the event of an ambiguity, courts must construe the contract "in favor of the insured," *Henderson*, 596 N.W.2d at 194, but courts "should not create ambiguity in an insurance policy where the terms of the contract are clear and precise," *id.* at 193. And "the fact that a policy does not define a relevant term does not render the policy ambiguous." *Id.* at 194.

> If the insurance policy fails to define a term, the court must interpret it according to its commonly used meaning, taking into account the reasonable expectations of the parties. That is, the policy language in insurance contracts is to be accorded its

> commonly used meaning unless it is apparent from reading the instrument as a whole that a different or special meaning was intended.

*Prestige*, 99 F.3d at 1350.

The Michigan Supreme Court has explained that the term "accidental bodily injury" carries its ordinary, plain meaning in an insurance-disability contract. *See Nehra v. Provident Life & Accident Ins. Co.*, 559 N.W.2d 48, 51 (Mich. 1997). To ascertain the ordinary meaning of the term "accidental bodily injury," we can look to dictionaries, including legal dictionaries. *Minges Creek, LLC v. Royal Ins. Co. Of Am.*, 442 F.3d 953, 956 (6th Cir. 2006). According to Black's Law Dictionary, "accidental injury" means "[a]n injury resulting from external, violent, and unanticipated causes; esp., a bodily injury caused by some external force or agency operating contrary to a person's intentions, unexpectedly, and not according to the usual order of events." Black's Law Dictionary (9th ed. 2009). "Bodily injury" means "physical damage to a person's body." *Id.*

Insurance-law treatises provide further clarification. "Infirmity or other result of the normal aging process is not an accident or accidental, nor are clearly biological, medical conditions, despite the fact that they are known as an 'accident' in the medical community." 10 Couch on Insurance § 139.14 (3d ed. 1997). "A cerebrovascular accident, for example, is a stroke, and rarely meets the definition of an accident for purposes of insurance law unless some external trauma can be shown to have produced it." *Id.* at § 141:4.

Reading all of this together, we conclude that the term "accidental bodily injury" in this policy refers to physical damage to the body caused by an external, violent, unanticipated cause that is neither clearly medical nor biological. A stroke, or a "cerebrovascular accident" in medical terminology, is not an "accidental bodily injury" under the policy simply because the word

"accident" appears in the medical term. King's disability-inducing stroke can only be an accidental bodily injury if it were caused by an "external, violent, unanticipated cause." Accordingly, we must determine whether King has shown the existence of a genuine issue of material fact regarding whether his stroke was caused by an external, violent, unanticipated cause.

### C.

The district court, adopting the recommendation of the magistrate judge, held that there was no genuine issue of material fact regarding the cause of King's disability. The court concluded that "there simply is no evidence, medical or otherwise, (from the 1970s) in the record indicating that Dr. King's fall on December 8, 1977 had anything to do with his stroke on December 9, 1977—or that Dr. King believed the events were even remotely related." Accordingly, because it found no genuine issue of fact, the report recommended (and the district court agreed) that summary judgment was appropriate. This was error.

To be sure, much of the evidence in the record suggests that for nearly 30 years, the parties proceeded as if King's stroke were the result of sickness, and not accidental bodily injury. The original physician's report, the statement of claim forms, the notes from King's interview during Mass Life's investigation, Dr. Schriner's letter of clarification describing the incident, and the 1987 letter from Mass Life all support the conclusion that King's disability was caused by sickness. But not all of the evidence points this way. In opposing Penn Life's summary-judgment motion, King offered the affidavit of Dr. Christopher Sweet, a neuro-radiologist that had reviewed King's medical records from the time of his stroke. Having reviewed those records, Dr. Sweet concluded that "based upon reasonable medical probability," King's brain injury was caused by a combination of his

"neurological-symptoms producing" fall in the snow on December 8, 1977, the high altitude in Alta, and a "deep bleed in the small vessels on the left side" of King's brain. Dr. Sweet's conclusion was based on the fact that King did not have "any underlying symptoms or signs of an impending stroke" before he fell in the snow, leading him to believe that King's stroke first manifested itself when his face and limbs went numb after his fall.

This conclusion contradicts Penn Life's claim that King's disability was caused by sickness. Accordingly, Dr. Sweet's affidavit creates a genuine issue of material fact regarding whether King's disability was caused by sickness or accidental bodily injury. If it accepted Dr. Sweet's opinion about the role of the fall, a jury would have sufficient evidence to find that King's stroke was caused by an external, violent, unanticipated cause (i.e., an accidental bodily injury). Although Dr. Sweet's affidavit could have been more descriptive and could have included more detail about the physiology supporting his medical opinion, and although he does not address what, if anything, to make of the fact that King's father had died of a stroke at age 48 and that King's angiogram reportedly showed an arteriovenous malformation, a jury guided by cross-examination would be well-equipped to decide what caused King's disability. In other words, based on the record before us, resolving this dispute is the province of the jury.

The district court held otherwise after it discounted and disregarded Dr. Sweet's affidavit because it was "similar to the physician opinion rejected" by the court in *Brock v. Zurich American Insurance Co.*, 2009 WL 2244610 (E.D. Tenn., July 27, 2009). This was improper. It is true that "expert witnesses cannot create a question of fact by simply stating conclusions on ultimate issues," *Worldwide Equip., Inc. v. United States*, 605 F.3d 319, 326 (6th Cir. 2010), because "[a]n expert

who supplies nothing but a bottom line supplies nothing of value to the judicial process," *Brainard v. Amer. Skandia Life Assurance Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) (citation omitted). But at the same time, judges must not independently weigh the evidence in the record or make credibility determinations at the summary-judgment stage. *See Anderson*, 477 U.S. at 249; *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). Rather, we must determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Viewed through the proper lens, Dr. Sweet's affidavit is not merely conclusory and differs from those we have deemed insufficient to defeat summary judgment. In *Brainard*, for example, we affirmed the district court's rejection of an expert affidavit regarding the existence of an agency relationship because it "employ[ed] broad and dramatic language without substance" and contained no "meaningful analysis or reasoning" *Id.* And in *Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488, 493 (6th Cir. 2005), an asbestos-related products-liability case, we approved the district court's rejection of an expert affidavit that "[did] not provide a basis for a causation finding as to any particular defendant."[2] Moreover, the disregarded physician's opinion in *Brock* appeared in the form of a letter (not a sworn affidavit) that contradicted some of the same physician's conclusions in an earlier letter. *See Brock*, 2009 WL 2244610, at *2.

By contrast, Dr. Sweet's affidavit was sufficiently reasoned and detailed to create a dispute of material fact. Dr. Sweet stated that he had reviewed the relevant medical records and described the specific factors and symptoms (or absence thereof) that supported his conclusion. His opinion

---

[2]Further, allowing the expert's conclusory affidavit to defeat summary judgment in *Lindstrom* would have rendered meaningless the Sixth Circuit's test for causation in maritime product liability cases, which requires that a defendant's product be a "substantial factor" in causing the injury in question. *Lindstrom*, 424 F.3d at 493.

was not conclusory: he did not definitively claim that King's stroke was caused by his fall. Rather,

he concludes that, "based upon reasonable medical probability," the stroke was caused by several

factors, including King's fall in the snow. Indeed, Dr. Sweet's affidavit was similar in form and

substance to those that courts have deemed sufficient to defeat a motion for summary judgment. *See,*

*e.g.*, *Ambrosini v. Labarraque*, 966 F.2d 1464, 1470 (D.C. Cir. 1992).

III.

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND**

the case for further proceedings consistent with this opinion.