[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11893

_____

ROCKWATER, INC.,
d.b.a. Peerless Manufacturing Company,

Plaintiff-Appellee,

*versus*

UNITED STATES OF AMERICA,
By and Through Its Agent, The Commissioner
of Internal Revenue,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

D.C. Docket No. 4:21-cv-00125-CDL

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and HULL, Circuit Judges.

HULL, Circuit Judge:

This appeal requires us to decide whether specially designed peanut trailers that dry and transport peanuts from farm fields to off-site buying points on public roads are "off-highway transportation vehicles" that are exempt from a 12 percent excise tax that applies to the first retail sale of "[t]ruck trailer and semitrailer chassis" and "[t]ruck trailer and semitrailer bodies." 26 U.S.C. §§ 4051(a)(1)(C), (D), 7701(a)(48)(A)(i).

An Internal Revenue Service ("IRS") audit determined that Plaintiff-Appellee Rockwater, Inc., doing business as Peerless Manufacturing Company, owed excise taxes on the sale of three peanut-drying trailers. Rockwater paid the taxes, statutory interest, and penalties but filed a claim for a refund from the IRS. Rockwater then filed this lawsuit against the United States, the Defendant-Appellant, for a full refund and attorney's fees. The district court granted summary judgment in favor of Rockwater as to its refund request for the excise taxes, statutory interest, and penalties, but denied Rockwater's request for attorney's fees. The United States appealed.

After review, and with the benefit of oral argument, we conclude that the district court erred in concluding that

Rockwater's peanut-drying trailers are "off-highway transportation vehicles" that are exempt from the tax. *Id*. § 7701(a)(48)(A)(i). We reverse in part the grant of summary judgment to Rockwater and remand with instructions to enter final judgment for the United States for taxes and statutory interest. Given the government did not appeal the penalties, we affirm the district court's ruling that Rockwater is not required to pay penalties.

## I.    BACKGROUND

### A.    The Peanut Harvesting Process

Nearly half of the United States' peanuts are produced in Georgia, where farmers harvest the crop each fall. At the start of the eight-to-ten-week harvest, farmers dig up the peanuts from the ground and leave them in the fields for a few days to dry in the sun. Drying is a critical stage in the process. Failing to dry the peanuts within a few hours of harvesting can cause them to develop mold and produce harmful aflatoxins.

Peanuts contain over 25 percent moisture at harvest and must contain no more than 10.49 percent moisture to be safe and salable. Thus, sun drying alone is insufficient. To finish drying the peanuts, most commercial farmers use mechanical peanut-drying trailers and wagons that transport the peanuts off-site to be dried with fans.

### B.    Rockwater's Peanut-Drying Trailers

The relevant facts about Rockwater's trailers are not disputed. In 1954, Peerless designed the first mechanical

peanut-curing system, which consisted of a drying box affixed on wheeled axles and connected to a drying fan.  In 2016, after Rockwater acquired Peerless, David Rogers and David Peeler purchased Rockwater and reengineered the trailers.  In 2017, Rockwater began manufacturing and selling 45- and 48-foot peanut-drying trailers under the Peerless name.

Rockwater's trailers consist of a steel drying box welded to a chassis.  The chassis comprises an I-beam that runs the length of the chassis.  At one end of this I-beam are two oversized sand feet, which provide additional stability while the trailers are in the fields.  At the other end are two axles with four wheels on each axle.  The steel drying box has eight-foot-tall side walls, an open top, a raised 40 percent perforated floor, and an 18-inch-tall gap, or "plenum," that runs the length of the trailer below the perforated floor, where the drying fan connects and blows warm air that rises through the peanuts and out the open top.  Other features of the drying box are its horizontally-hinged rear door, which allows peanuts to be unloaded by hydraulically lifting the trailer at an angle for the peanuts to empty out the back.  The trailers can carry about 20 to 23 tons of peanuts.  Here is a picture of Rockwater's peanut trailer.



Farmers ordinarily use Rockwater's trailers in the following manner. The farmers load the harvested peanuts into the trailers' open tops and drive the trailers to a drying shed that usually is located at an off-site buying point (collectively, "buying point").[1] The "typical[]" distance from the field to the buying point is about 20 miles. Approximately two-thirds of those 20 miles are on public roads. The trailers make an average of two to three trips each week from the fields to the buying points.

It is necessary to move the trailers to the drying sheds because the drying fans that attach to the trailers require gas and

---

[1] The parties do not dispute that although some farms have their own drying sheds, most drying sheds are located at centralized peanut-buying points.

electricity, which are unavailable in the fields. The fans run continuously for about a day on average, after which the peanuts are emptied from the trailers and the trailers are returned to the fields to begin the process again.

The trailers are not conducive to all-purpose transportation needs. Their all-steel construction makes the trailers heavier than most other trailer types, and the 18-inch plenum raises the trailers' center of gravity, which increases the rollover risk. The perforated flooring cannot support dense loads. Nor can the trailer be loaded from the back because the rear door is hinged horizontally to allow for gravitational unloading when the trailer is lifted at an angle.

Still, several design features facilitate the trailers' trips from the fields to the drying sheds by public road. The trailers "operate by road speed limits." Although the trailers can safely travel 55 miles per hour, Rockwater provides no maximum speed recommendation. The trailers ordinarily are not designated oversize or overweight, so they do not require special markings or special permits to operate on the public roads. The trailers use standard semitrailer tires because Rockwater "d[id] not want to burden [its] customers with specialized tires." The trailers also come with standard brakes, lights, and reflective stripes that comply with federal and state law for public roadway operation. And before a sale, the trailers undergo a Department of Transportation ("DOT") inspection and receive vehicle identification numbers.

In addition, Rockwater's online advertisement for the trailers provides a bulleted list of the trailers' features.  The first bullet point states that placing the stress of the load on the chassis and not the body "allows the safest most reliable method for handling your crop from the field to the buying point."

## C.    Procedural History

The IRS audited Rockwater for failing to file a quarterly federal excise tax return for its sale of three trailers in the second quarter of 2017.  After the IRS determined that the 12 percent tax applied to the trailer sales, Rockwater paid $37,031.76 in excise taxes, penalties, and interest.

Rockwater then filed a claim for a refund with the IRS.  Rockwater then filed this lawsuit challenging the application of the excise tax to its trailer sales and requesting a refund and attorney's fees.  In its complaint, Rockwater alleged that its trailers were exempt from the excise tax on the first retail sale of highway vehicles because the trailers are "off-highway transportation vehicles."  *See* 26 U.S.C. §§ 4051(a)(1)(C), (D), 7701(a)(48)(A)(i).  The first retail sale means the first time a trailer is sold.  *See id.* § 4051(a)(1).  The excise tax does not apply to resales of the same trailer thereafter.  *See id.*

After discovery, Rockwater and the United States filed cross-motions for summary judgment.  The district court granted summary judgment in favor of Rockwater as to the taxes.  The district court also ruled that "[e]ven if it were determined that Rockwater owed the tax, it still had reasonable cause not to pay it

initially" and so neither statutory interest nor penalties were appropriate.

The United States appealed as to the taxes and statutory interest but not as to the penalties. As the government argues, and Rockwater now does not dispute, the Internal Revenue Code (the "Code") provides that penalties are subject to a "reasonable cause" exception, *see* Code § 6651(a)(1), but statutory interest is not, *see id.* §§ 6601(a), 6621. So the statutory interest depends on whether Rockwater owed the excise taxes or whether its peanut-drying trailers are exempt. That is the legal issue we examine.

## II.    STATUTORY AND REGULATORY OVERVIEW

### A.    Standards of Review

We review the statutory interpretation and application of the Code *de novo*. *C.I.R. v. Driscoll*, 669 F.3d 1309, 1311 (11th Cir. 2012). We also review a grant of summary judgment *de novo*. *Thai Meditation Ass'n of Ala. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023).

In tax refund lawsuits, the IRS Commissioner's assessment has "the support of a presumption of correctness." *Welch v. Helvering*, 290 U.S. 111, 115 (1933). "[E]xemptions from taxation are to be construed narrowly." *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 59-60 (2011) (citation and quotation marks omitted).

## B.    Federal Excise Tax on "Highway Vehicles"

The Code imposes a 12 percent tax on the first retail sale of "[t]ruck trailer and semitrailer chassis" and "[t]ruck trailer and semitrailer bodies." 26 U.S.C. § 4051(a)(1)(C), (D). The Code does not define those terms. But Congress authorized the Secretary of the Treasury to pass rules and regulations to enforce the Code. *Id.* § 7805(a).

In turn, the relevant Treasury Regulations clarify that a chassis and body are taxable under Code § 4051(a) "only if such chassis or body is sold for use as a component part of a <u>highway vehicle</u>." Treas. Reg. § 145.4051-1(a)(1)(ii), (a)(2) (emphasis added). The Treasury Regulations also define "highway vehicle" as "any trailer or semitrailer, designed to perform a function of transporting a load over public highways, whether or not also designed to perform other [functions]." *Id.* § 48.4061(a)-1(d)(1). A "public highway" includes "any road (whether a Federal highway, State highway, city street, or otherwise)" which is not a private roadway. *Id.*

The Treasury Regulations further provide that "in determining whether a vehicle is a 'highway vehicle,' it is immaterial that the vehicle is designed to perform a highway transportation function for only a particular kind of load." *Id.* Examples of a "highway vehicle" are "passenger automobiles, motorcycles, buses, and highway-type trucks, truck tractors, trailers, and semi-trailers." *Id.* A vehicle that is not a "highway vehicle" is a "nonhighway vehicle." *Id.*

Here, Rockwater's trailers are sold as a component part of a highway vehicle, which standing alone would make them taxable. The focus of Rockwater's appeal is on another provision in the Code that exempts "off-highway transportation vehicles" from the 12 percent excise tax. We turn to that provision.

## C.    Exemption for Off-Highway Transportation Vehicles

In the Code, Congress has defined types of "off-highway transportation vehicles" to which the § 4051(a) tax does not apply. 26 U.S.C. § 7701(a)(48). Section 7701(a)(48)(A)(i) provides that "[a] vehicle shall not be treated as a highway vehicle" under § 4051(a) if these two special design requirements are met:

> (1) the "vehicle is specially designed for the primary function of transporting a particular type of load other than over the public highway and"
>
> (2) because "of this special design such vehicle's capability to transport a load over the public highway is substantially limited or impaired."

*Id.* § 7701(a)(48)(A)(i).[2] The next statutory subsection also provides that "a vehicle's design is determined solely on the basis of its physical characteristics." *Id.* § 7701(a)(48)(A)(ii).

---

[2] Section 7701(a)(48)(B) adds another exception. It provides that nontransportation trailers and semitrailers, which function only as enclosed stationary shelters, also are exempt. 26 U.S.C. § 7701(a)(48)(B). This exception is not involved in this case.

Finally, Code § 7701(a)(48)(A) provides that we may consider several factors in assessing whether the vehicle's capability to transport a load over a public highway is "substantially limited or impaired": (1) "the size of the vehicle"; (2) "whether such vehicle is subject to the licensing, safety, and other requirements applicable to highway vehicles"; and (3) "whether such vehicle can transport a load at a sustained speed of at least 25 miles per hour." *Id.* § 7701(a)(48)(A)(i), (iii).

With this background, we turn to the parties' arguments.

## III.   DISCUSSION

The parties do not dispute that because Code § 7701(a)(48)(A)(i) uses "and" to connect the two requirements, Rockwater's trailers must satisfy both criteria to be exempt from taxation as "off-highway transportation vehicles." *See Schlumberger Tech. Corp. & Subsidiaries v. United States*, 55 Fed. Cl. 203, 220 (2003) ("The off-highway use exception is a two-part, conjunctive test."). In other words, we must reverse if Rockwater's trailers fail to satisfy <u>either</u> of Code § 7701(a)(48)(A)(i)'s criteria.

## A.   The Trailers Are Not Specially Designed to Transport Peanuts Off-Highway

The initial issue is whether Rockwater's trailers meet the first requirement of being "specially designed for the primary function of transporting" peanuts "other than over the public highway." 26 U.S.C. § 7701(a)(48)(i). This special design requirement asks whether the vehicle is specially designed for the primary function of <u>transporting</u> a load off public highways. *See id.*

The statutory requirement does not ask about the type of load being carried or non-transportation features of the vehicle. *See id.* Instead, this first requirement focuses on the primary, special <u>transportation</u> design of the vehicle, instead of the non-transportation purposes it might also serve. *See id.*

The physical characteristics that Rockwater cites do not establish that the primary transportation purpose of its trailers is off-highway use. Rockwater points to features like (1) the I-beam and oversized sand feet providing greater stability in the field, (2) the perforated floor and plenum allowing for drying fans to blow warm air up through the peanuts, and (3) the open top and the hinged rear gate facilitating the loading and unloading of the peanuts.

Although the oversized sand feet lend the trailers stability when stationary, the sand feet serve no purpose during transport. And in considering the transportation function of these trailers, it is immaterial whether the top is open or the floors are perforated or the rear door is hinged. What matters is that these design features serve the purpose of drying peanuts primarily in stationary locations like buying points. They do not establish a primary purpose of transporting peanuts.

As the government points out, the trailers are outfitted with standard highway equipment that allows the trailers to operate at 55 miles per hour. Although the trailers are specially designed to facilitate the drying of peanuts, their special peanut-drying design has nothing to do with off-highway transportation.

Let's consider a similar challenge brought in the Sixth Circuit involving the application of the same highway vehicle tax, *id.* § 4051(a), to a coal-hauler dump truck. *See Worldwide Equip., Inc. v. United States*, 605 F.3d 319, 321 (6th Cir. 2010). In *Worldwide*, a heavy truck dealer challenged the application of the tax to its coal-hauler dump trucks. *Id.* To haul coal in the muddy, gravelly Appalachian coal fields, the coal-hauler dump trucks were outfitted with (1) a special engine, transmission, and rear axle combination; (2) an oversized steel dump body; and (3) special off-road tires. *Id.* at 327-28. Evidence reflected that the rear axles and special tires would overheat if the truck was operated at or above 35 to 40 miles per hour for any length of time. *Id.* at 328. Holding that sufficient evidence precluded summary judgment for the government on the special design prong, the Sixth Circuit explained that the evidence suggested that the coal-hauler dump trucks were specially designed to haul coal off-road in the coal fields. *Id.* at 326-27, 331. The Sixth Circuit noted that this special design for off-highway transportation was apparent from the coal-hauler dump trucks' special frames, engines, transmissions, and off-road tires and the need for special permits to operate the trucks on the highway due to their size and weight. *Id.* at 326-28.

Unlike in *Worldwide*, the special features that Rockwater calls our attention to are specific to peanut drying, not transporting the peanuts. *See id.* Indeed, the physical characteristics relevant to assessing the trailers' transportation design are its standard tires, its ability to operate by road speed limits, and its DOT-compliant brakes, lights, and reflective stripes, all of which support

Rockwater's advertisement that the trailers are the "safest most reliable method for handling your crop <u>from</u> the field <u>to</u> the buying point." (Emphasis added). In fact, Rockwater's advertisement reveals that the trailers' ability to transport peanuts from fields to buying points, which almost always requires travel over public roads, is the primary goal of its <u>transportation</u> design. The presence of these highway transportation features coupled with the absence of specific features for off-highway transportation establish that the trailers were not specially designed for the primary purpose of moving peanuts off-highway. And without specific off-highway transportation design features, the fact that the trailers are capable of being towed in the fields does not, without more, establish that off-highway transportation is a special design, much less the primary function. *See Fla. Power & Light Co. v. United States*, 56 Fed. Cl. 328, 333 (2003) (holding that vehicles designed for extreme weather conditions for use by a utility company were not off-highway vehicles because their design for <u>frequent</u> off-road use was not the same as being <u>primarily</u> designed for off-road use).

The First Circuit rejected an argument like Rockwater's when it held that hydraulic boat trailers were not off-highway vehicles. *See Hostar Marine Transp. Sys., Inc. v. United States*, 592 F.3d 202, 212-13 (1st Cir. 2010). The First Circuit explained that although the hydraulic boat trailers exhibited some special design features, those features either were irrelevant to their "on-versus off-highway function" or supported their "on-highway function." *Id*. at 213. For example, the First Circuit considered the boat trailers' open-center frames, hydraulic components, and stub axles,

but concluded that no evidence supported the inference that the features were related to the <u>roads</u> on which the trailers traveled instead of the <u>boats</u> that they hauled.  *Id.*  The First Circuit also pointed to several features that "emphatically point[ed] towards their special design for *on*-highway transportation," such as DOT-compliant brakes, lighting, tires, and wheel coverings and the ability to travel at normal highway speeds.  *Id.*

Likewise, the transportation features of Rockwater's peanut-drying trailers, including its DOT compliance and ability to travel by normal road speed limits on public highways without special permits or markings, evince that their primary transportation design was for use on public roads.  Without this design, no matter the peanut-drying features on the trailers, the peanuts would be marooned in the fields, unable to reach the critical drying fans at the buying points.

Based on the first requirement in § 7701(a)(48)(A)(i), the peanut-drying trailers do not meet the statutory definition of "off-highway transportation vehicles," and the district court's grant of summary judgment to Rockwater must be reversed. Nevertheless, we also consider the trailers' ability to meet the second requirement below.

## B.    The Trailers' On-Highway Capability is Not Substantially Limited or Impaired

The next issue is whether the trailers' capability to carry cargo over the public highways is substantially limited or impaired. Code § 7701(a)(48)(A)(iii) provides several factors to consider in

assessing whether a vehicle's capability is substantially limited or impaired, including the size of the vehicle, its safety and licensing features, and its ability to travel over 25 miles per hour. *See* 26 U.S.C. § 7701(a)(48)(A)(iii). All these factors weigh in the government's favor.

First, the trailers are not designated as oversize or overweight. This means that the trailers do not require special permits to operate. Second, the trailers go through DOT inspection before sale and have DOT-compliant brakes, lights, and reflective stripes. The trailers also are marketed as safe to handle loads of peanuts from the fields to the buying points, which Rockwater acknowledges almost always requires travel on public roads. The trailers can travel by "road speed limits" of 55 miles per hour, too, well above the 25-mile-per-hour threshold.

Notably, all the statutory factors concern physical characteristics of the vehicle. *See id.* § 7701(a)(48)(A)(ii), (iii). This is why Rockwater's arguments about the trailers' economic feasibility and the short duration of the harvest season are unpersuasive. As the Court of Federal Claims explained, the "words 'substantially limited or substantially impaired' are [not] synonymous with impaired efficiency of vehicle operation." *Fla. Power & Light Co.*, 56 Fed. Cl. at 333-34 (rejecting the argument that the utility vehicles' designs, which made them heavier, slower, and less fuel-efficient, did not substantially limit or impair their use on public highways). Moreover, Rockwater relies on evidence about the type of cargo that its trailers are designed to carry, instead of

evidence that the trailers are substantially less capable of traveling on public roads.  It argues that its trailers' raised center of gravity increases the rollover risk, but this is not dispositive.  Despite the increased rollover risk, which is not unique to these trailers, the trailers remain capable of safely operating by road speed limits and do not need special markings or permits for highway travel.

Because Rockwater failed to establish that its trailers were off-highway transportation vehicles, 26 U.S.C. § 7701(a)(48)(A)(i), that are exempt from taxation, *id.* § 4051(a)(1), the government was entitled to summary judgment on the taxes and statutory interest.

## IV.    THE DISSENT

### A.    Excise Taxes

The dissent agrees Rockwater owes the excise taxes.  While the Court identifies two independent reasons why, the dissent joins only the reason in Part III.A.  As to the second reason in Part III.B, our dissenting colleague argues there is a jury issue.  But this ignores that the parties' cross-motions for summary judgment agreed that no material facts were in dispute and, on appeal, the parties did not argue that a jury question exists on any issue.  We properly decide the legal issues that the parties identified and litigated.

### B.    Statutory Interest

The Code provides for mandatory statutory interest on the taxes owed here.  *See* 26 U.S.C. § 6601.  Because Rockwater owes

taxes, it automatically owes interest. Yet our dissenting colleague would have us rule that Rockwater does not owe interest. This is a nonsensical result that no one asks for. As set forth below, Rockwater has never argued that it did not have to pay interest on taxes owed by Rockwater.

Starting in the district court, the parties litigated over whether Rockwater owed the excise taxes and penalties. Even if it owed the taxes, Rockwater argued that penalties are subject to a reasonable cause defense.[3] However, Rockwater never argued that reasonable cause would supply a defense to the mandatory statutory interest.

The district court's summary judgment order held that Rockwater did *not* owe the excise taxes. As a brief alternative ruling, the district court concluded that even if Rockwater owed the taxes, it had reasonable cause not to pay them initially and did not owe the penalties.

That section of the order, entitled "Penalties," cited only the penalty statute and cases about reasonable cause in the context of owing penalties. The order did not cite the mandatory interest statute, or any interest cases, or discuss interest at all. Yet in that Penalties section the district court *sua sponte* and mistakenly lumped interest in its reasonable cause ruling, even though that exception applies *solely* to penalties.

---

[3] Failing to file a tax return at all incurs a penalty "unless it is shown that such failure is due to reasonable cause and not willful neglect." 26 U.S.C. § 6651(a).

Given the district court's *sua sponte* and elementary mistake, the United States argued on appeal that the district court's order "should not be interpreted to hold that its 'reasonable cause' finding exempts Rockwater from statutory interest" because the Code provides that *penalties* are subject to a "reasonable cause" exception, *see* Code § 6651(a)(1), but statutory interest is not, *see id.* §§ 6601(a), 6621. Indeed, the government succinctly cited the relevant law: "*Compare* I.R.C. § 6651(a) (penalty is subject to a reasonable cause exception) *with* I.R.C. § 6621 (interest is not)." As the government said at oral argument, "There's not much more to say than that." Given the instant context of mandatory, statutory interest, the government's argument did everything necessary to explain the elementary legal error by the district court. Notably, too, Rockwater does not claim the government abandoned or failed to preserve the interest error on appeal; only our dissenting colleague does.

And importantly, Rockwater also has never claimed that even if it owed the taxes, it did not owe interest.

At oral argument, the United States clarified that it did not challenge the reasonable cause penalty ruling, but it maintained that no reasonable cause defense applies as to the mandatory statutory interest. Rockwater did not dispute this either during oral argument or in its response brief. The record before us is clear that both parties have always understood that Rockwater's liability for interest is automatic if it is required to pay the excise taxes. That's the way the tax law works.

What this means is that everyone but our dissenting colleague recognizes that the mandatory, statutory interest has and continues to rise and fall solely on the issue of the excise taxes. And because we do not represent one party or the other, we decline to litigate an "issue" and affirm an alternative ruling that yields an illogical result that *no* party has requested either in the district court or on appeal.

## V.    CONCLUSION

We **REVERSE** the grant of summary judgment to Rockwater, **REMAND** for entry of final judgment in favor of the United States on Rockwater's complaint as to the excise taxes and statutory interest, and **AFFIRM** the finding that Rockwater is not required to pay penalties.

**REVERSED IN PART AND AFFIRMED IN PART.**

23-11893    LUCK, J., concurring and dissenting in part    1

LUCK, Circuit Judge, concurring in part and dissenting in part:

The district court granted summary judgment for Rockwater, Inc. and ordered that the company be refunded three separate pots of money: (1) excise taxes that Rockwater paid to the government; (2) interest that the government imposed for the delay in paying the excise taxes; and (3) penalties the government imposed for delaying payment on the taxes. On appeal, the government raised only "one issue" related to the first pot of money—the excise taxes refund.

But the government did not argue that the district court erred in ordering the refund for the second pot of money—interest. The word interest did not appear in the issue section of the government's initial brief. It did not appear in the summary of the argument. And it did not appear in the argument section. Not "plainly and prominently," as we require to preserve an issue for appeal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (quotation omitted). Not at all in those sections of the initial brief. That means the interest refund issue has been abandoned. *See United States v. Willis,* 649 F.3d 1248, 1254 (11th Cir. 2011) ("A party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. . . . Where a party fails to abide by this simple requirement, he has waived his right to have the court consider that argument." (quotation, citation, and brackets omitted)); *Access Now, Inc. v. Sw. Airlines Co.,* 385 F.3d 1324, 1330 (11th Cir. 2004) ("Any issue that an appellant wants [us] to address should be specifically and clearly identified in the brief. . . . Otherwise, the issue—even

2          Luck, J., concurring and dissenting in part     23-11893

if properly preserved at trial—will be considered abandoned."); *Marek v. Singletary,* 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned." (citation omitted)).

The government's only substantive reference to interest was in a footnote in the statement-of-the-case section of the initial brief. But the footnote was not enough to preserve sufficiently for appeal the interest refund issue. *See Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987) ("In this case, the single footnote in the Secretary's initial brief did not sufficiently preserve the mootness issue."); *see also Asociacion de Empleados del Area Canalera v. Panama Canal Comm'n*, 453 F.3d 1309, 1316 n.7 (11th Cir. 2006) ("[T]hat argument is waived because it appears only in a footnote in their initial brief and is unaccompanied by any argument." (citation omitted)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 (11th Cir. 1989) ("Although Greenbriar refers to the district court's dismissal of its amendment in its Statement of the Case in its initial brief, it elaborates no arguments on the merits as to this issue in its initial or reply brief. Accordingly, the issue is deemed waived."). And if the footnote wasn't enough to preserve the issue, then the citations hidden at the end of the buried footnote in the statement-of-the-case section of the brief certainly were not enough either. Nobody points to any case holding otherwise.

Even if the lone reference in the statement-of-the-case footnote was enough to preserve the interest refund issue, the government did not argue that the district court erred in ordering the

23-11893    LUCK, J., concurring and dissenting in part    3

interest refund. Instead, sans citations, the two-sentence footnote said: "The [district] court also held that to the extent Rockwater was not liable for the tax, it was not liable for the interest on the tax. The court should not be interpreted to hold that its 'reasonable cause' finding exempts Rockwater from statutory interest."

But there is no other way to interpret the district court's order. The district court found that "Rockwater had reasonable cause for any delay in paying the tax." And then the district court applied that finding to order the interest refund: "Because Rockwater does not owe the tax, and alternatively because it otherwise had reasonable cause for its delay in paying it, neither penalties nor interest are appropriate." The only way to read what the district court wrote is that the "reasonable cause" finding applied to Rockwater's request for a penalty refund *and* an interest refund. Because the government didn't raise the interest refund issue, and because, even if it did, the government is wrong in its statement-of-the-case footnote, I would affirm that part of the district court's order.

The majority opinion comes to a contrary conclusion because, it says, Rockwater never argued or claimed on appeal that it was due an interest refund. But this turns the preservation rules on their head. Rockwater is the appellee. It won the three specific pots of money in the district court, including a refund on the interest it paid to the government because there was reasonable cause for the delay in payment. Rockwater had no obligation to challenge an issue it won below. None. Besides, Rockwater did argue that the government "did not address," and therefore "abandoned,"

4                LUCK, J., concurring and dissenting in part      23-11893

any argument that the district court erred in finding reasonable cause.  Not just me.

The only party with the obligation to raise on appeal any errors with the district court's order was the government as the appellant.  If the government really believed, as the majority opinion does, that the district court erred in awarding interest based on the reasonable cause finding, then it should have plainly and prominently raised the issue on appeal, as every other appellant is required to do.   But not only did the government fail plainly and prominently to raise the interest refund issue, it failed even to mention the word interest in the argument section of its brief.  Not one time, which means we must affirm.

That result is neither illogical nor nonsensical.  Instead, it flows naturally from an appellant's failure to challenge a specific pot of money awarded by the district court.  Affirming is what we have done in countless appeals where the appellant has not sufficiently preserved an issue, and it is what we would do in any other appeal where the appellant does not plainly and prominently raise an issue.  That is as true for the government as it is for any other party-appellant.

★    ★    ★    ★

For the other pots of money—the refunds for the excise taxes and the penalties—I concur in the judgment.  As the majority opinion explains, there were two requirements that Rockwater had to meet to qualify for the off-highway transportation vehicle exemption to the excise tax.  Rockwater had to show that:  (1) its

23-11893    LUCK, J., concurring and dissenting in part    5

peanut wagon "is specially designed for the primary function of transporting a particular type of load other than over the public highway"; and (2) because "of this special design such vehicle's capability to transport a load over the public highway is substantially limited or impaired." 26 U.S.C. § 7701(a)(48)(A)(i). In Part III.A., the majority opinion elegantly and comprehensively explains why there's no genuine dispute that Rockwater did not meet the first requirement. I happily join that part of the opinion.

We could have ended there because, as the majority opinion explains, Rockwater's peanut wagon "must satisfy both criteria to be exempt from taxation as 'off-highway transportation vehicles.'" Because the peanut wagon clearly didn't meet the first requirement, the company was not exempt from the excise tax. But the majority opinion, in Part III.B., then goes on to decide that there's no genuine dispute that Rockwater did not meet the second exemption requirement.

I wouldn't reach the second requirement because, to me, whether there's a genuine dispute that the special design of the peanut wagon substantially limited or impaired the wagon's capability to transport a load over the public highway is a harder call and an unnecessary one. The majority opinion is right that the statutory factors weigh in the government's favor. But the statutory factors are not exclusive, and other factors weigh in favor of Rockwater.

Rockwater's peanut wagon, for example, had an all-steel design, oversized sand feet, an open top, a top-hinged lift gate, and a perforated floor that is raised eighteen inches higher than a normal

6                LUCK, J., concurring and dissenting in part      23-11893

trailer's floor.  The all-steel design and oversized sand feet increased the peanut wagon's weight, which hindered its capability to transport loads economically over the public highways.  The open top exposed the load to the elements, the top-hinged lift gate disallowed traditional loading and unloading, and the perforated floor was far weaker than a normal one.  Those features made it difficult, if not impossible, to transport anything other than peanuts.  And the raised floor raised the wagon's center of gravity, which increased the rollover risk during transport.

With similar evidence, two of our sister circuits have affirmed jury verdicts finding a substantial limitation under the second requirement.  *See GLB Enters. v. United States*, 232 F.3d 965 (8th Cir. 2000); *Flow Boy, Inc. v. United States*, No. 82-1823, 1984 WL 15513 (10th Cir. Jan. 20, 1984).  In *Flow Boy*, for example, the Tenth Circuit affirmed the jury's verdict finding that the specialized cement trailers' capability to transport a load over public highways was substantially limited because it was not economically efficient to operate the loaded cement trailers on the public highway.  *See* 1984 WL 15513, at **1–2.  The Tenth Circuit explained that the jury's finding was supported by credible evidence showing that the cement trailers were too heavy to carry optimal loads over the public highway, hindering the trailers' economic efficiency.  *See id*.

Similarly, in *GLB Enterprises*, the Eighth Circuit affirmed a jury's verdict finding that the specialized cotton trailers' capability to transport a load over public highways was substantially limited because it was less safe to operate the loaded cotton trailers on the

23-11893      LUCK, J., concurring and dissenting in part                7

public highway. *See* 232 F.3d at 967. There, the cotton trailers' special design features—that significantly increased its weight (which impaired braking) and changed its center of gravity (which increased rollover risk)—made the trailers dangerous enough that a special permit was necessary to operate the trailers over public highways when loaded at a certain capacity. *Id*. at 968. Even though the peanut wagon here did not require a special permit to operate over the public highways, its special design features, which increased the wagon's weight and rollover risk, raised similar economic and safety concerns as *Flow Boy*'s cement trailers and *GLB Enterprises*'s cotton trailers.

The majority opinion doesn't address some of these contrary facts or the caselaw from our sister circuits because, it says, "the parties' cross-motions for summary judgment agreed that no material facts were in dispute and, on appeal, the parties did not argue that a jury question exists on any issue." But whether the peanut wagon's special design substantially limited or impaired its capability to transport a load over the public highway was very much in dispute, as it was in *Flow Boy* and *GLB Enterprises*. Indeed, the dispute takes up an entire section of the government's initial brief. In any event, the majority opinion misses the point. We should not go out of our way to reach an alternative ground (whether it's a judge question or jury question) where there's some doubt whether we're right. Better to decide only one ground where we're clearly right than to stretch to decide a second unnecessary alternative ground where we're not.

8           LUCK, J., concurring and dissenting in part     23-11893

Because the majority opinion is so clearly right about the first exemption requirement in Part III.A., I would resolve the excise tax refund issue on that ground without getting into the more complicated conflicting evidence on the second exemption requirement.